[No. F025718. Fifth Dist. Jan. 13, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN JEFFREY MILLER, Defendant and Appellant.

## COUNSEL

John Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stan Cross and Patrick J. Whalen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BUCKLEY, Acting P. J.**—Defendant Brian Jeffrey Miller was convicted after jury trial of two counts of illegally possessing an explosive (picric acid and smokeless powder), two counts of illegally possessing a destructive device (incendiary and tracer ammunition), one count of illegally possessing dangerous fireworks, and one count of misdemeanor child endangerment.[1] He contends on appeal that his suppression motion should have been granted and that instructional errors necessitate reversal. We disagree and will affirm.

### FACTS

During the morning of August 6, 1995, Randy Raines saw a small child wandering around the neighborhood unattended. His wife, Jona Bowen-Raines, approached the child, who was calling for his mother. Lywinda

---

[1]Defendant's wife, codefendant below, was acquitted on all counts alleged against her.

Brittain Keast noticed the pair and approached. Ms. Keast told Ms. Bowen-Raines that the boy was named Jeffrey, and where he lived. Ms. Keast had found him alone in the street 10 days ago and had taken him back to the Miller residence. Ms. Bowen-Raines took Jeffrey to her house and called the police.

Bakersfield Police Officer Robert Grady arrived at the Raines's residence shortly before 11:00 a.m. He spoke with both Ms. Bowen-Raines and Ms. Keast. Both women "expressed their concern about the Millers leaving their children unattended on different occasions." Officer Grady then took Jeffrey back to the Miller residence. The front door was open about two inches. Officer Grady knocked on the door, rang the bell, and announced himself. He yelled that he "was from the Bakersfield Police Department," and asked whether "anybody was home." Receiving no response, he knocked several more times and again announced that he was from the police department. Officer Grady then pushed the door open and again announced himself. There was still no answer. The officer stepped inside the house. He was holding Jeffrey's hand.

Officer Grady saw defendant in a hallway near the kitchen. He asked defendant if the boy was his child and whether he lived at the residence. Defendant answered yes to both questions. He told the officer that he had been asleep and he did not know where his wife or other children were. Officer Grady asked defendant for identification, but defendant was unable to produce any. Officer Grady observed that defendant seemed very nervous, was slow to respond to questions, repeatedly indicated that he was thirsty, and had dilated pupils. Based on these observations, he believed defendant might be under the influence of cocaine or methamphetamine. When asked, defendant denied being under the influence of narcotics. Officer Grady then asked defendant for permission to search for any other children and for narcotics. Defendant replied, " 'Sure, go ahead. I don't have anything.' "

Numerous firearms, explosives, ammunition, dangerous chemicals, and firearms were found in the residence and garage. Literature discussing bomb making, sniper fire, and the Oklahoma City bombing was also discovered.[2]

---

[2]Inside the house officers found a loaded RIA-brand assault-type AR-15 style rifle leaning against a wall in the master bedroom, a 30/30 lever-action rifle, a 12 gauge shotgun, a .45-caliber handgun, a .25-caliber handgun, a 9-millimeter handgun, two large boxes of fireworks containing 3,000 or 4,000 firecrackers, several military-style metal ammunition cans, four cans of smokeless powder with a total weight of 37.13 pounds, cannon fuse, a replica of an M-203 military grenade launcher loaded with homemade fireworks, and firearms

DISCUSSION

## I. *The suppression motion.*

Defendant filed a Penal Code section 1538.5[3] motion in which he argued, in relevant part, that the warrantless entry into his home violated his constitutional protection against unreasonable search and seizure, that Officer Grady did not comply with the knock-notice rule, that he did not consent to the search, and that its scope was excessive. The trial court rejected these arguments and denied the motion. Defendant challenges this ruling. As will be explained, we agree with defendant that the knock-notice rule is applicable here. However, since the warrantless entry was justified by exigent circumstances and Officer Grady provided adequate notice of his presence and intent prior to entry, the prerequisites to access were satisfied. Moreover, defendant voluntarily consented to the search and it did not exceed the scope of his consent.

### A. *Knock-notice.*

A complete analysis of the knock-notice question presented here first requires a determination whether the warrantless entry itself was justified. ██ "[A] warrantless entry by the police into a residence is at least presumptively unreasonable and therefore unlawful." (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1297 [248 Cal.Rptr. 834, 756 P.2d 221].) However, "[t]he emergency exception to the warrant requirement has long been recognized in this state." (*People* v. *Osuna* (1986) 187 Cal.App.3d 845, 851 [232 Cal.Rptr. 220].) "Entry for the purpose of the protection of infant children must be justified on the same grounds as any other entry; there must be 'an imminent and substantial threat to life, health or property.' " (*People* v. *Sutton* (1976) 65 Cal.App.3d 341, 352 [134 Cal.Rptr. 921].) " 'There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " (*People* v. *Osuna, supra,* 187 Cal.App.3d at p. 851.) "Two steps are involved in deciding whether exigent circumstances

---

parts and fuse. A locked gun cabinet was found to contain tracer ammunition, incendiary ammunition, and some BB guns.

Inside the garage there were numerous stacked boxes containing various chemicals. Lead nitrate was found in a baby bottle. A bottle labeled "Chem 4 Synth" was tested and found to contain picric acid. A container labeled as picric acid and what appeared to be bomb components were found in a freezer.

Written material found in the house included a book about making explosives entitled Boom, another book entitled, The Ultimate Sniper Manual, a computer-generated drawing of the Oklahoma City bombing, and a videotape entitled, Fire Storm in the Desert, Machine Gun Magic.

[3]Unless otherwise noted, all statutory references are to the Penal Code.

existed to justify a warrantless entry: '[F]irst, factual questions as to what the officer knew or believed and what action he [or she] took in response; second, a legal question whether that action was reasonable under the circumstances. [Citation.] On appeal, a reviewing court must affirm the trial court's determinations of the factual questions if they are supported by substantial evidence, but must take the ultimate responsibility for deciding the legal question according to its independent judgment.' " (*People* v. *Higgins* (1994) 26 Cal.App.4th 247, 251 [31 Cal.Rptr.2d 516]; see also *People* v. *Duncan* (1986) 42 Cal.3d 91, 97-98 [227 Cal.Rptr. 654, 720 P.2d 2].)

*In re Dawn O.* (1976) 58 Cal.App.3d 160 [128 Cal.Rptr. 852] is instructive. There, Dawn went to a friend's house at approximately 6:15 p.m. Several hours later the friend's housekeeper called the authorities. The responding officer and Dawn walked back to her apartment. During the trip he gathered the impression that she had a sister. After knocking on the front door several times and receiving no answer, he entered the apartment and discovered two small children who had been left alone inside. The court upheld the entry, writing that "[a]n effort to return a small child to its home after it has been found locked out, lonely and unattended is not unreasonable. Further, under such facts, it is not unreasonable to determine if the child may be safely left at its home. The discovery of the unattended child here reasonably gave rise to the concern that another child might be unattended in the house." (*Id.* at p. 164.)

Applying these principles to the instant case, we find the evidence of exigency to be clear. Jeffrey was found wandering the neighborhood wearing only a diaper and calling for his mother. Only a two-year-old, Jeffrey could not tell the officer whether he had wandered off and gotten lost, fled a dangerous situation or had been abandoned. Officer Grady was told that on at least one prior occasion when Jeffrey had been found unsupervised, a parent was actually at home. Thus, he had no way of knowing whether one or both of Jeffrey's parents were at home, and if so, whether they were simply unaware that their child had left the house or if they were in need of assistance.[4] Moreover, Officer Grady had been told that there were other children living in the Miller residence. He had no idea as to their whereabouts or condition. When he arrived at the Miller residence the door was slightly open, indicating that someone might be inside. Yet, when

[4]These facts distinguish the instant case from *People* v. *Smith* (1972) 7 Cal.3d 282 [101 Cal.Rptr. 893, 496 P.2d 1261], in which the high court found that warrantless entry into an apartment to locate the parent of a child who had been abandoned was unjustified. There, the child was six years old and she specifically told the officer that her mother was not home. (*Id.* at p. 286.)

he rang the bell, repeatedly knocked and announced his presence, there was no answer. The totality of the circumstances support the propriety of Officer Grady's entry into the Miller residence to determine whether Jeffrey's parents and siblings were home, if they were in need of assistance, and whether Jeffrey could be safely reunited with them. (*In re Dawn O., supra,* 58 Cal.App.3d at p. 164; see also *People* v. *Sutton, supra,* 65 Cal.App.3d at pp. 349-352.)

We therefore turn to the manner of entry. Section 844, commonly known as the knock-notice statute, only references entries made for the purpose of arrest.[5] However, the demand and explanation requirements of this section were but a codification of existing common law. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) ■ And in *People* v. *King* (1971) 5 Cal.3d 458, 464 [96 Cal.Rptr. 464, 487 P.2d 1032], our Supreme Court wrote, ". . . the requirements for forcing entry to make an investigation should be no less stringent than they are where entry is made under a search warrant or for the purpose of arresting someone." It then explained, " 'The purposes and policies underlying section 844 are fourfold: (1) the protection of the privacy of the individual in his home [citations]; (2) the protection of innocent persons who may also be present on the premises where an arrest is made [citation]; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice [citations]; and (4) the protection of police who might be injured by a startled and fearful householder.' Although there is no statutory requirement with respect thereto, it would appear that the same policy should govern in cases where entry is sought for the purpose of investigating possible criminal offenses." (5 Cal.3d at p. 464, fn. 3.) In the decades following publication of *King,* our high court has not repudiated or qualified these comments.

Respondent urges us to dismiss *King's* discussion of this issue as dicta and hold that police officers may make warrantless intrusions into private homes for investigatory purposes without providing the occupants with any notice of their arrival. This we will not do.

■ First, this court has previously recognized "that the dicta of our Supreme Court are highly persuasive." (*Evans* v. *City of Bakersfield* (1994) 22 Cal.App.4th 321, 328 [27 Cal.Rptr.2d 406].) As is explained in *In re*

---

[5]This section provides: "To make an arrest, a private person, if the offense is a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing the person to be, after having demanded admittance and explained the purpose for which admittance is desired."

*Brittany M.* (1993) 19 Cal.App.4th 1396, 1403 [24 Cal.Rptr.2d 57], even if such language "does not have the force of binding precedent, we do not deem it 'inadvertent, ill-considered or a matter lightly to be disregarded.' [Citation.] Indeed, we find it highly germane and compellingly persuasive." Second, we find the Supreme Court's discussion of this point to be cogent and convincing. ▮ It is settled that "[a] warrantless entry or search must be 'proportionate to the exigency excusing the warrant requirement,'" and narrowly circumscribed to minimize the intrusion upon the privacy of a home. (*People* v. *Gentry* (1992) 7 Cal.App.4th 1255, 1261, fn. 2 [9 Cal.Rptr.2d 742].) The purposes and policies underlying the knock-notice rule have equal force whether the police are invading one's sanctum to investigate or to arrest. It should be obvious that a violent confrontation is more likely to occur if the occupants have no notice that the person who has just burst through their door is a police officer and not a malefactor. At the moment of entry, the purpose for the intrusion is irrelevant to the startled and fearful occupants. Moreover, the occupants' privacy interest is not unworthy of protection because the entry is to determine child safety issues or to investigate possible criminal activity rather than to effect an arrest. Indeed, in both *In re Dawn O., supra*, 58 Cal.App.3d 160, and *People* v. *Sutton, supra*, 65 Cal.App.3d 341, the officers knocked and waited for a response before entering the residences at issue. ▮ We therefore conclude that, in the absence of circumstances requiring instantaneous entry or where knock-notice will increase the danger of a violent confrontation,[6] police must comply with the knock-notice rule prior to entering a residence for investigative purposes.

▮ Here, the surrounding circumstances were sufficiently disturbing to necessitate Officer Grady's entry into the home. However, no showing was made that the situation constituted such a compelling crisis that compliance with the knock-notice rule was excused. We also reject respondent's assertion that knock-notice was not required here because the door was ajar. It is established that notice must be given even if the door is open. (*People* v. *Bradley, supra*, 1 Cal.3d at p. 88; *People* v. *Zabelle* (1996) 50 Cal.App.4th 1282, 1286 [58 Cal.Rptr.2d 105].) Thus, knock-notice was required prior to entry.

This said, we now turn to the heart of the issue. Did Officer Grady comply with the knock-notice rule? We answer this question in the affirmative. "[I]t is recognized that section 844 may be satisfied with substantial compliance." (*People* v. *Galan, supra*, 163 Cal.App.3d at p. 795.) The officer knocked,

---

[6]Knock-notice is excused in certain emergency situations and on those occasions in which it would increase an officer's peril or frustrate the arrest. (*People* v. *Galan* (1985) 163 Cal.App.3d 786, 795 [209 Cal.Rptr. 837].)

rang the bell, identified himself as a peace officer, and asked whether anyone was home. In asking whether anyone was home, he adequately identified the purpose of his visit which was, in fact, to ascertain whether anyone was inside the residence.[7] Receiving no answer, he again knocked on the door and identified himself as a peace officer. These actions satisfied the legal prerequisite to entry. (*People* v. *Galan, supra,* 163 Cal.App.3d at p. 795.)

### B. *Consent.*

■ Defendant testified that Officer Grady had not asked for and he did not give consent to the search. He also claimed that the officer peppered him with questions, refused him permission to get a glass of water, and told him "you get out of line with me, and I will put you down."

Officer Grady testified that he did not badger the defendant, and did not make any promises or threats to obtain defendant's consent. Defendant was not handcuffed when he consented to the search and the officer's gun was not drawn. While he did not allow defendant to go into the kitchen for a glass of water, he brought defendant water before searching the residence. Defendant never tried to stop or limit the search. In fact, he gave Officer Grady the key to his gun cabinet.

Sergeant Tsitakis testified that defendant was just a few feet away when Officer Grady told him that defendant had consented to search of his residence and when he conveyed this information to another officer. On neither occasion did defendant indicate by word or action either that he had not consented or that his consent was coerced.

The court found that defendant had consented to the search, explaining that although Officer Grady "was not the most articulate, complete or dynamic witness ever to take the witness stand, he was honest and truthful." Defendant challenges this ruling, arguing the People did not show that his consent was voluntary.

■ "The prosecution bears the burden of showing that the consent to a search is voluntary and unaffected by duress or coercion. [Citations.] In every case, the voluntariness of a consent is a factual question to be decided in light of all the circumstances. [Citation.] The trial court's findings, on the issue of consent, whether express or implied, will be upheld on appeal if supported by substantial evidence." (*People* v. *Aguilar* (1996) 48

---

[7] In any event, "[s]ubstantial compliance is sometimes found even though officers have failed to state their purpose before entering." (*People* v. *Keogh* (1975) 46 Cal.App.3d 919, 927 [120 Cal.Rptr. 817].)

Cal.App.4th 632, 639 [55 Cal.Rptr.2d 716].) Trial courts may accept an officer's testimony that defendant freely consented to the search even in the face of conflicting testimony from defense witnesses. (*People* v. *Ratliff* (1986) 41 Cal.3d 675, 687 [224 Cal.Rptr. 705, 715 P.2d 665].)

Defendant points to his restricted freedom inside his own home and Jeffrey's presence in the room as proof that his consent was involuntary. We disagree. The fact that defendant was detained at the time he consented is not determinative. (See, e.g., 41 Cal.3d at pp. 686-687.) We do not find Jeffrey's presence in the room to constitute an implicit threat that the child would be removed if defendant did not consent to the search. The testimony of Officer Grady and Sergeant Tsitakis adequately supports the trial court's implied finding that defendant's consent was voluntary.

### C. *Scope of the search.*

Defendant consented to a search for narcotics and children. Even after the weapons were found, the search continued to be "just as much for narcotics as it was for weapons." Miscellaneous books, papers, and a videotape were found in the master bedroom and living room area of the residence. Officer Grady testified that "[a] lot of it was just laying about. Others were under the bed. There were other types of materials over the top of them that were removed." Defendant contends the seizure of this material exceeded the scope of his consent. Once again, we disagree.

The scope of a consensual search for narcotics is very broad and includes closets, drawers, and containers. (See, e.g., *People* v. *Gurtenstein* (1977) 69 Cal.App.3d 441, 447, 450-451 [138 Cal.Rptr. 161]; *People* v. *Blair* (1979) 25 Cal.3d 640, 657 [159 Cal.Rptr. 818, 602 P.2d 738].) " '[I]n the course of conducting a reasonable search [the police do] not have to blind themselves to what [is] in plain sight simply because it [is] disconnected with the purpose for which they entered.' " (*People* v. *Duncan, supra,* 42 Cal.3d at p. 99.) As the writings and videotape were discovered in places where narcotics or narcotic-related evidence could have been secreted, and narcotics could have been hidden in and among the stacks of papers and books, the search did not exceed the scope of defendant's consent. (*People* v. *Blair, supra,* 25 Cal.3d at p. 657.)

### II. *Instructional issues.*

### A. *Comments to the jury.*

"A California trial court may comment on the evidence, including the credibility of witnesses, so long as its remarks are accurate, temperate,

and 'scrupulously fair.' [Citation.] Of course, the court may not express its views on the ultimate issue of guilt or innocence or otherwise 'usurp the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses.' [Citation.] The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made." (*People* v. *Melton* (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741].)

During the jury's deliberations, the jury sent out the following note: "The jury is having a problem with Count # 5 (Picric Acid). [¶] What makes it illegal if it can be purchased by anyone anywhere according to testimony. We need Section 12305 of the Health & Safety Code explained." In response, the court read the jury portions of Health and Safety Code sections 12305 and 12303. Section 12305 provides, "Every person not in the lawful possession of an explosive who knowingly has any explosive in his possession is guilty of a felony." In relevant part, section 12303 provides, " 'Lawful possession of an explosive,' . . . means possessing explosives in accordance with the stated purpose and conditions of a valid permit obtained pursuant to the provisions of this part . . ." The court then inquired of the jurors whether it had adequately answered their question. The foreperson replied, "Well, the question merely came up hearing some of the testimony that it could be purchased most anywhere, and we didn't know whether or not you needed a permit or not to purchase it. That was the question I believe from one of the jurors." In relevant part, the court offered the following comments in reply:

"All right. I'm going to go out on a limb here. Okay. But I feel I should out of fairness to you folks and out of fairness to me.

"A, you need a permit; B, I think I remember which witness said you can go purchase that any time, any place.

". . . . . . . . . . . . . . . . . . . . . . . .

"The witness who was asked if you could walk into any store and buy this stuff off the shelf was never asked if he had ever done it. That witness had no personal knowledge of whether that could be done or not.

"I suggest strongly that you think back to which witness that was and then ask yourself if that witness first of all was ever asked if he had actually done that.

"And then number two, I would you suggest [*sic*] that when you discover, as I think you will, that that person has never actually done it, that you take

a look at what that particular person does for a living, and if it is a person who is a criminalist working for a crime lab who obtains all his chemicals through the crime lab by ordering through the crime lab and by virtue of its permit, I think that might tell you that when that witness was answering that particular question, that was nothing more than an opinion with no foundation underlying it because the person had never actually gone out and done that."

After the jury retired, defendant objected to the court's comments and motioned for the court to strike them and to so inform the jury. The motion was denied. Thereafter, the jury returned a guilty verdict on this count.

 Defendant argues that the court's comments exceeded the bounds of fair and impartial judicial comment on the state of the evidence. He challenges the court's opinion that Gregory Laskowski's testimony that anyone could walk in and purchase picric acid from a chemical supply house was not based on personal knowledge. He further contends: "[that the court incorrectly] went on to state that the witness obtained his chemicals through the lab by virtue of its permits. Laskowski simply never testified to these facts, nor was there any other evidence regarding how the lab obtained chemicals or whether or what kind of permits the lab possessed."

Although the court did not reference the specific witness who testified regarding the availability of picric acid, the parties agree, and our review of the record supports their conclusion, that the court was referring to the testimony of Laskowski, supervising criminalist with the Kern County Regionalistics Laboratory. He testified that People's exhibit 2C was a small vial containing picric acid.[8] On cross-examination, Mr. Laskowski testified that picric acid can be bought at chemical supply houses in quart size or larger jars. He has not personally gone to chemical supply stores, but has ordered material from chemical supply stores "and picric acid is in the catalog." However, he has never ordered picric acid. The following exchange then occurred:

"[DEFENSE COUNSEL]: And then it shows up at your doorstep?

"[LASKOWSKI]: Essentially, yes.

"[DEFENSE COUNSEL]: How is it delivered?

"[LASKOWSKI]: Well, I haven't ordered any picric acid, so I don't know, but I assume it's delivered by the people who deliver all our chemicals.

---

[8]Picric acid is generally unstable. It "is used in some fireworks manufacturing and also as a high explosive. In World War 2 or World War 1 it was used for artillery shell and torpedoes in that type of material."

"THE COURT: Sir, your imagination is wonderful, but really, these attentive 14 people knew from when we were picking them to pay attention to what the facts are and what conjecture is. You have seen it available through catalogs that are available to you; correct?

"[LASKOWSKI]: That's correct.

"THE COURT: But as you sit there now, you have never had any delivered to you?

"[LASKOWSKI]: Never.

"THE COURT: And you don't recall anything specific being said with regard to shipping instructions with regard to picric acid, do you?

"[LASKOWSKI]: That's correct.

"THE COURT: Let's stop right there then. And we don't have to guess about the modes of transport that might be utilized, counsel.

"[DEFENSE COUNSEL]: Of these chemicals, all these chemicals that you have been talking about today, excepted the RDX, which ones, if any, to your knowledge could not been [sic] picked up at a chemical supply store?

"[LASKOWSKI]: I believe they all can be.

"[DEFENSE COUNSEL]: Are you aware if any of them require special permits?

"[LASKOWSKI]: I'm not aware."

We find the court's remarks recognizing the speculative nature of Mr. Laskowski's testimony about the general availability of picric acid and disabusing the jury of the erroneous belief that picric acid could "be purchased by anyone anywhere" to be legally correct and temperate. It is generally unlawful to sell an explosive to a person who does not possess a valid permit. (Health & Saf. Code, § 12120.) Mr. Laskowski's testimony on this topic lacked factual foundation. He had never ordered any picric acid or personally gone into a chemical supply store and attempted to purchase the chemical. In fact, he did not even know that, unless statutorily excepted, a permit is required to legally possess the substance.

Yet, defendant is correct in one limited respect: the court's comment that the laboratory obtained its chemicals "by virtue of its permit" was unsupported by trial testimony. Although one could reasonably conclude from Mr.

Laskowski's testimony that the Kern County Regionalistics Laboratory obtained its chemicals by ordering them from a chemical supply business, there was no testimony "whether or what kind of permits the lab possessed."

However, defendant suffered no prejudice. The jury was correctly informed that it is unlawful to possess an explosive without a valid permit. It was completely irrelevant to the determination of defendant's guilt whether the laboratory for which Mr. Laskowski worked possessed chemical permits. It is not reasonably probable that this comment affected the verdict. (*People v. Melton, supra,* 44 Cal.3d at p. 736.)

### B. *"Dangerous fireworks."*

Defendant next argues that the trial court had a sua sponte obligation to define the term "dangerous fireworks" when it instructed the jury on the elements of the crime of illegally possessing dangerous fireworks in violation of Health and Safety Code section 12677, a misdemeanor. We agree; however, after applying *People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869], we find the error to be harmless under the California and United States Constitutions.[9]

"It is the trial court's duty to see that the jurors are adequately informed on the law governing all elements of the case to the extent necessary to enable them to perform their function. This duty is not always satisfied by a mere reading of wholly correct, requested instructions." (*People v. Reynolds* (1988) 205 Cal.App.3d 776, 779 [252 Cal.Rptr. 637], overruled on another ground by *People v. Flood, supra,* 18 Cal.4th 470.) "[E]ven in the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial." (*People v. Flannel* (1979) 25 Cal.3d 668, 680-681 [160 Cal.Rptr. 84, 603 P.2d 1].) "Additionally, the trial court has a *sua sponte* duty to give explanatory instructions even in the absence of a request when the terms in an instruction 'have a "technical meaning peculiar to the law." ' [Citations.] No such duty is imposed when the terms 'are commonly understood by those familiar with the English language, . . .' " (*People v. Valenzuela* (1985) 175 Cal.App.3d 381, 393 [222 Cal.Rptr. 405], overruled on another ground by *People v. Flood, supra,* 18 Cal.4th 470.)

---

[9]"Since defendant's due process rights include the right to have the jury determine every element of the offense [citation], and since '[i]t is the trial court's duty to see that the jurors are adequately informed on the law governing all elements of the case to the extent necessary to enable them to perform their function' [citation], appellant's failure to request the instruction does not waive the issue." (*People v. Shoals* (1992) 8 Cal.App.4th 475, 490 [10 Cal.Rptr.2d 296].)

 While the phrase "dangerous fireworks" may be understood in a general sense, the term has a technical meaning peculiar to the law. The term is defined in Health and Safety Code section 12505. This section provides that " 'Dangerous fireworks' includes all of the following" items enumerated therein. One is guilty of violating Health and Safety Code section 12677 only if one possesses "dangerous fireworks" within the meaning of section 12505. Proof that the fireworks are "dangerous" as defined in section 12505 is therefore part of an element of the charged offense. Accordingly, the jury should have been instructed on the statutory definition of "dangerous fireworks." (*People* v. *Shoals, supra,* 8 Cal.App.4th at pp. 489-491; *People* v. *Hill* (1983) 141 Cal.App.3d 661, 668 [190 Cal.Rptr. 628]; *People* v. *Valenzuela, supra,* 175 Cal.App.3d at p. 393.)

However, we reject defendant's contention that the error is per se reversible. Some appellate courts have found the lack of full instruction on the meaning of one or more elements of a criminal offense to be inherently prejudicial.[10] Yet, in *People* v. *Flood, supra,* 18 Cal.4th 470, our state Supreme Court recently held that instructional error affecting an element of the offense is not a structural defect requiring automatic reversal of the conviction under either the California or United States Constitution. (*Id.* at pp. 490, 504.) The court first explained, "Like involuntary confessions, instructional errors that have the effect of removing an element of a crime from the jury's consideration encompass a broad spectrum of circumstances and may be assessed in the context of the evidence presented and other circumstances of the trial to determine whether the error was prejudicial. The development of various exceptions to the reversible-per-se rule for instructional error affecting an element of a crime, including the *Cantrell-Thornton* exception, 'implicitly revealed the fundamental incompatibility of a reversible-per-se rule with the basic premise of the governing state constitutional provision.' [Citation.] . . . Rather than perpetuating an ostensible reversible-per-se rule that is riddled with exceptions meant to delineate circumstances in which such instructional error categorically may be deemed harmless—a rule that is fundamentally inconsistent with the language and purpose of the specific California constitutional harmless error provision embodied in article VI, section 13, of the California Constitution—we hold . . . that the prejudicial effect of such error is to be determined, *for purposes of California law*, under the generally applicable prejudicial error test embodied in article VI, section 13." (18 Cal.4th at pp. 489-490.) It next analyzed applicable United States Supreme Court authorities and concluded, "The foregoing United States Supreme Court decisions lead us to conclude that an instructional error that improperly describes or omits an element of an offense, or that raises an improper presumption or directs a finding or a partial verdict

---

[10]See *People* v. *Shoals, supra,* 8 Cal.App.4th at pages 490-491.

upon a particular element, generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution. Indeed, the high court never has held that an erroneous instruction affecting a single element of a crime will amount to structural error [citation], and the court's most recent decisions suggest that such an error, like the vast majority of other constitutional errors, falls within the broad category of trial error subject to *Chapman* review." (18 Cal.4th at pp. 502-503.) The court then found the instructional error at issue to be harmless beyond a reasonable doubt, explaining that "[u]nder the circumstances of the present case, reversing defendant's conviction because of an instructional error concerning an uncontested, peripheral element of the offense, which effectively was conceded by defendant, was established by overwhelming, undisputed evidence in the record, and had nothing to do with defendant's own actions or mental state, would erode the purpose and rationale of the harmless error doctrine and promote disrespect for the judicial system." (18 Cal.4th at p. 507.)

We will assume for purposes of this discussion that the instructional error at issue implicates defendant's federal due process rights. We therefore "proceed to consider whether it appears beyond a reasonable doubt that the error did not contribute to [the] jury's verdict." (18 Cal.4th at p. 504.) Here, just as in *Flood*, we find the omission to be harmless.

Health and Safety Code section 12505, subdivisions (b) and (d) provide that firecrackers and Roman candles are dangerous fireworks. Sergeant Shrider, a certified bomb technician, offered undisputed testimony that 3,000 or 4,000 firecrackers and an additional quantity of Roman candle bottle rockets were found in defendant's house. During closing arguments, the prosecutor argued that these fireworks were dangerous and "could blow a child's hand off." Defendant's attorney did not respond to this argument or even reference this charge during her closing argument. Further, codefendant's attorney impliedly conceded that the fireworks were dangerous during his argument that the prosecution had failed to prove she knowingly possessed them.

"Although a defendant's tactical decision not to 'contest' an essential element of the offense does not dispense with the requirement that the jury consider whether the prosecution has proved every element of the crime" (18 Cal.4th at p. 505), in *Flood*, the court found that defendant's failure to contest was tantamount to a concession of the element at issue. (*Ibid.*) We likewise conclude that in the present case defendant effectively conceded that the fireworks were dangerous within the meaning of the law. Moreover, the undisputed evidence clearly established that the fireworks were

"dangerous" within the meaning of Health and Safety Code section 12505, subdivisions (b) and (d). We are therefore satisfied that the record establishes beyond a reasonable doubt that the instructional error could not have affected the verdict and was therefore harmless. (18 Cal.4th at pp. 504-507.)

Further, just as in *Flood,* the error at issue falls within "the *Cantrell-Thornton* exception to reversible error." (18 Cal.4th at p. 505.) The parties here "recognized the omitted element was at issue, presented all evidence at their command on that issue, and the record not only establishes the element as a matter of law but shows the contrary evidence not worthy of consideration." (*Id.* at p. 506.) This provides additional support for "our conclusion that the instructional error in question may be found nonprejudicial under the governing *Chapman* standard." (*Ibid.*)

### C. *"Destructive device."*

■■■■ Section 12303 prohibits possession of a destructive device. In relevant part, section 12301, subdivision (a)(1) provides that the term "destructive device," includes, "[a]ny projectile containing any explosive or incendiary material or any other chemical substance, including, but not limited to, that which is commonly known as tracer or incendiary ammunition, *except tracer ammunition manufactured for use in shotguns.*" (Italics added.) The jury was given CALJIC No. 12.55[11] and further instructed that "a destructive device, as I have used that term here, means incendiary ammunition with regard to Count 3 and tracer ammunition with regard to Count 4." It has previously been determined that " '[i]n instructing a jury it is proper for a trial court to explain and define terms which might otherwise lead to confusion.' [Citation.] 'Destructive device' is such a term." (*People v. Dimitrov* (1995) 33 Cal.App.4th 18, 26 [39 Cal.Rptr.2d 257].)

Defendant argues that the definition of destructive device given by the court was incomplete. It should have given the special instruction proposed by counsel for codefendant which states that "tracer ammunition is defined as a destructive device only if it is not manufactured for use in shotguns," and further provides that to find defendant guilty of possessing tracer ammunition, they must find that the People "proved beyond a reasonable

---

[11]This instruction provides,

"Every person, firm, or corporation, who within California possesses any destructive device is guilty of a violation of Section 12303 of the Penal Code, a crime.

"In order to prove such crime each of the following elements must be proved:

"1. A person within California exercised control or the right to control a destructive device;

"2. Such person had knowledge of the presence and of its nature as a destructive device."

doubt that [the] tracer ammunition was not manufactured for use in shotguns."[12] As will be explained below, a showing that the tracer ammunition was manufactured for use in shotguns is an affirmative defense upon which the defendant bears the burden of proof. Therefore, the instruction proffered by codefendant is legally incorrect. It is axiomatic that the trial court is not required to give erroneous instructions. Moreover, since this defense was not relied on below and the record does not contain substantial evidence supporting its application, the court had no sua sponte obligation to craft and give a legally correct instruction on this point.[13]

Trial courts are required to accurately and completely instruct jurors as to the elements of charged offenses. (*People* v. *Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892], overruled on another ground by *People* v. *Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) However, trial courts must instruct sua sponte on a defense only "if it appears the defendant is relying on the defense or if there is substantial evidence to support the defense and it is not inconsistent with defendant's theory of the case." (*People* v. *Whitehurst* (1992) 9 Cal.App.4th 1045, 1049 [12 Cal.Rptr.2d 33].) Thus, resolution of this issue first requires a determination whether the phrase "except tracer ammunition manufactured for use in shotguns," is an element of the offense of illegally possessing a destructive device or whether it is an affirmative defense to the charge.

*People* v. *Fuentes* (1990) 224 Cal.App.3d 1041 [274 Cal.Rptr. 17] (hereafter *Fuentes*) and *In re Andre R.* (1984) 158 Cal.App.3d 336 [204 Cal.Rptr. 723] (hereafter *Andre R.*) are instructive. *Andre R.* analyzed section 12021.5 which provided, in pertinent part, " '[a] minor may not possess a concealable firearm unless he or she has the written permission of his or her parent or guardian to have such firearm or is accompanied by his or her parent or guardian while he or she has such firearm in his or her possession.' " (158 Cal.App.3d at pp. 340-341.) The court determined that the People did not bear the burden of proving that the defendant did not have the permission of a parent to possess the firearm at issue. The court explained, "[i]t is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant." (*Id.* at p. 341.) The pertinent inquiry is whether the matter excepted is so incorporated as to become a part of the enacting clause. Unless so incorporated, it is a matter of defense. "Here, the existence of written parental permission does not define

---

[12]Defendant joined in all of the instructions specially requested by codefendant's counsel. The record does not indicate why this instruction was not given.

[13]Respondent failed to directly address the issue.

or describe the offense." (*Id.* at p. 342.) Moreover, the existence of written permission is a fact peculiarly within defendant's knowledge. Thus, subjecting him to the burden of producing exonerating evidence would not be unduly harsh or unfair. (*Ibid.*)

*Fuentes* followed the same line of reasoning as *Andre R.* In *Fuentes*, the court rejected defendant's argument that CALJIC No. 16.005 improperly shifted the burden of proof as to an element of the crime of illegally possessing a hypodermic needle or syringes in violation of Business and Professions Code section 4149. This section provided, " 'No person shall possess or have under his or her control any hypodermic needle or syringe except when acquired in accordance with the provisions of this article.' " (*Fuentes, supra,* 224 Cal.App.3d at p. 1044.) The contested instruction read, in part, " 'If the evidence establishes beyond a reasonable doubt that a defendant possessed such a needle or syringe, that defendant then has the burden of raising a reasonable doubt that he [lawfully] acquired such object.' " (*Ibid.*) The court explained, "[a] state may allocate the burden of persuasion to a criminal defendant through the device of an affirmative defense. The United States Supreme Court has afforded the states wide latitude in designating affirmative defenses." (*Ibid.*) It then found that in drafting this statute, ". . . the Legislature relegated to defendant the burden regarding lawful acquisition of a hypodermic needle," based on the rule " 'that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant.' " (*Id.* at p. 1045.) The section at issue did just that. Moreover, it was not harsh or unfair to place the burden of proving authorized possession on the defendant and this conclusion "is in accord with the practice in other jurisdictions . . . ." (*Id.* at p. 1046.)

Defendant would have this court rely on *People* v. *Gott* (1994) 26 Cal.App.4th 881 [31 Cal.Rptr.2d 840], in which the court found in a prosecution for unlawfully receiving ephedrine the People bear the burden of proving that a permit was required to lawfully possess the substance. This we cannot do. The statute considered in *Gott* is not analogous to the legislation at issue here. Moreover, *Gott*'s summary rejection of *Andre R.* and *Fuentes* in favor of a self-described "more subtle" approach to statutory construction is sophistic. (*Id.* at p. 885.) These earlier opinions actually relied on the same factors as did *Gott.*

Actually, it is *Fuentes, supra,* 224 Cal.App.3d 1041 and *Andre R., supra,* 158 Cal.App.3d 336 which are analogous. ■■■ The definitional statute at issue here first defines the operative clause and then sets forth an

exception thereto. This exception was not so incorporated within section 12301, subdivision (a) as to preclude the conclusion that the Legislature did not intend it to be part of the main body of the statute. In addition, the exception was not even referenced in section 12303. Moreover, considering the matter practically, if an individual purchased or received tracer ammunition for use in a shotgun, as opposed to a smaller caliber rifle, it would not be difficult for him to prove that the ammunition had been manufactured for this purpose. Thus, it is not unfair or harsh to place the burden on proof of this issue on the defendant. Accordingly, we conclude that proof of the purpose for which tracer ammunition was manufactured is an affirmative defense to the charge of possessing a destructive device, and not an element of the offense.[14]

As explained *ante*, sua sponte instruction on a defense must be offered only if the defendant is relying on it or if it appears there is substantial evidence to support the giving of the instruction and it is not inconsistent with the defendant's expressed theory of the case. (*People* v. *Whitehurst, supra,* 9 Cal.App.4th at p. 1049.) "It is not incumbent on the trial court to anticipate every possible theory that may apply to specific facts and then instruct the jury accordingly." (*People* v. *Koontz* (1970) 7 Cal.App.3d 30, 36 [86 Cal.Rptr. 374].) Here, the prosecution introduced testimony and a videotape showing tracer ammunition being fired from the RIA brand rifle found at defendant's house. Neither defendant nor codefendant proffered any evidence showing that the tracer ammunition found was actually manufactured for use in a shotgun. Furthermore, during their closing arguments counsel did not argue that the tracer ammunition was not a destructive device within the meaning of the law. In the absence of any evidence suggesting that the tracer ammunition was manufactured for use in shotguns or reliance on this defense below, instruction thereon was not required.

D. *CALJIC No. 2.90.*

Finally, defendant contends that instruction with CALJIC No. 2.90, as revised in 1994, permitted the jury to convict him on a standard of guilt less than the required standard of "beyond a reasonable doubt." (See § 1096 & *In re Winship* (1970) 397 U.S. 358 [90 S.Ct. 1068, 25 L.Ed.2d 368].) We rejected this argument in *People* v. *Light* (1996) 44 Cal.App.4th 879 [52 Cal.Rptr.2d 218] and dismiss it again for the same reasons set forth in our earlier opinion. Many other cases are in accord. (*People* v. *Godwin* (1996) 50

---

[14]For this reason, we summarily reject defendant's contention that the evidence is insufficient to support the verdict on this count. The claimed inadequacy rests on the premise that the People are required to prove that the ammunition was not manufactured for use in shotguns.

Cal.App.4th 1562, 1571-1572 [58 Cal.Rptr.2d 545]; *People* v. *Barillas* (1996) 49 Cal.App.4th 1012, 1022 [57 Cal.Rptr.2d 166]; *People* v. *Carroll* (1996) 47 Cal.App.4th 892, 895-896 [54 Cal.Rptr.2d 868]; *People* v. *Hurtado* (1996) 47 Cal.App.4th 805, 815-816 [54 Cal.Rptr.2d 853]; *People* v. *Tran* (1996) 47 Cal.App.4th 253, 262-263 [54 Cal.Rptr.2d 650]; *People* v. *Torres* (1996) 43 Cal.App.4th 1073, 1077-1078 [51 Cal.Rptr.2d 77].) Since this point has been unequivocally resolved in numerous published authorities, we expect appellate counsel to restrain themselves from raising this baseless contention in future appeals, thereby conserving both their time and ours, as well as the taxpayers' money.

## DISPOSITION

The judgment is affirmed.

Wiseman, J., and Levy, J., concurred.

A petition for a rehearing was denied February 9, 1999, and appellant's petition for review by the Supreme Court was denied April 14, 1999.