[No. A116034. First Dist., Div. Three. Feb. 21, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN MICHAEL STONE, Defendant and Appellant.

[No. A117978. First Dist., Div. Three. Feb. 21, 2008.]

In re STEVEN MICHAEL STONE on Habeas Corpus.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion, part A.

Counsel

Kieran D. C. Manjarrez, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Margo J. Yu, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**HORNER, J.**[*]—In these consolidated cases, defendant and appellant Steven Michael Stone appeals his jury trial conviction for petty theft with a prior on the grounds of ineffective assistance of counsel and instructional error, and also seeks habeas corpus relief on the basis of ineffective assistance of counsel. We deny defendant's petition for writ of habeas corpus and affirm the judgment.

Procedural Background

Following a preliminary hearing held on July 14, 2006, appellant was charged by an information filed on July 21, 2006, and amended on September 26, 2006, with petty theft with a prior theft felony, in violation of Penal Code sections 484, subdivision (a) and 666.[1] The information further alleged that appellant had suffered two prior serious or violent felonies, that he had served two prior prison terms, and that he was presumptively ineligible for probation pursuant to section 1203, subdivision (e)(4). On July 24, 2006, appellant entered a plea of not guilty and denied the special allegations. The trial court granted a defense request to bifurcate the trial on the prior convictions. The parties delivered opening statements to the jury on September 27, 2006. The jury found appellant guilty of theft by larceny on October 3, 2006. A court trial was held on the allegations, and the trial court concluded appellant had suffered a prior strike and two prior prison terms. At a sentencing hearing on November 16, 2006, the trial court denied appellant's motion pursuant to section 17, subdivision (b) to designate the offense of conviction a misdemeanor, as well as his motion pursuant to section 1385 to strike his prior strike conviction. Also, the trial court denied probation and sentenced appellant to the lower term of two years eight months on the offense of conviction, plus a consecutive two years for the prior prison terms, for a total sentence of

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Further statutory references are to the Penal Code unless otherwise noted.

four years eight months' imprisonment. Appellant filed a timely notice of appeal on November 28, 2006.

## FACTUAL BACKGROUND

Randy Shields testified that he had worked at Bruno's Foods in Lakeport, Lake County, for 23 years. During that time, he has had between 30 and 50 encounters with shoplifters in the store. Around 10:00 a.m. on November 1, 2005, Shields's attention was caught by a man entering the store because "he just didn't seem like he was there to grocery shop." To Shields, the man looked suspicious because he wore "lots of tattoos and a long, long coat, big pockets and just things you kind of look for as far as a shoplifter would go." Shields identified defendant in court as that same individual.

Shields stated that defendant walked past him down the aisle to the back of the store where the refrigerated items are kept. Shields followed defendant to the end of the aisle and "just kind of stood there like I was doing what I normally do at work and I just observed him for a few moments." Shields watched as defendant took a container of milk off the shelf and walked down to the beer section. Defendant placed the bottle of milk next to his pocket in his long jacket. Shields thought defendant was sizing it up to see if would fit in his pocket and was "pretty sure it was going to go in his pocket." However, defendant went back and exchanged the bottle of milk for another of a different size. Shields followed defendant as he walked through the store to the bakery/deli area with the bottle of milk in hand. Defendant walked about in front of the donuts, then "grabbed a white donut bag and put some donuts in there." Shields continued to observe defendant as "he paced back and forth a little bit, looked like maybe he was going to sit in a little seating area that we have and probably eat them. And I was just watching to see if that's what he was going to do without paying for them. And he didn't, he turned and went out the door."

Shields followed defendant out of the store and made contact with him. Shields was within three feet of defendant and asked him if he had forgotten to pay for something. Defendant dropped the bag of donuts. Shields took hold of defendant's arm and said, "You'll have to come back inside." Defendant said, "Get your fucking hands off me," pulled his arm away and ran off. Shields started to pursue defendant but the store owner told him to stop. Shields stated he had "a good clear observation" of defendant in the store for

about five to seven minutes from a short distance under brightly lit conditions. Outside the store, Shields was within arm's length of defendant and made physical contact with him. Shields stated that defendant's distinctive features were his shaved head and the tattoo on the back of his head in large bold letters of the word "Villains" as well as tattoos on both sides of his neck.

Someone from the store contacted the police and an officer arrived at the scene. Shields talked to the officer, stated what happened and gave a description of the suspect, including the fact that he had a tattoo on the back of his head. Sometime after the incident, another officer came to the store and asked Shields if he could identify the suspect from a photo lineup. The prosecutor showed Shields the photo lineup, which was marked at trial as defendant's exhibit B. Shields confirmed that defendant was shown in photo number 3 in the lineup. Shields said that at the time he saw the photo lineup he had never been to the Lake County jail, had never seen anyone who was in custody on a criminal matter, and had no idea of the significance of any garment worn by defendant in the photo lineup. Shields stated that with regard to the photo lineup he "paid no attention to what anyone was wearing [and] was looking at their faces."

Shields also stated that subsequent to the photo lineup, he recognized defendant without prompting in court at the preliminary hearing on July 14, 2006. Shields recalled that the preliminary hearing moved between three courthouses that day. When Shields entered the first courtroom he recognized defendant amongst a group of people. Shields went into the courtroom with no idea whether or not defendant would be there, looked around, and recognized defendant sitting in the jury box. Shields said he recognized defendant based on his memory and independent recollection of the events of November 1, 2005, not based on the photo lineup one month earlier.

City of Lakeport Police Officer David Mendoza stated that he contacted defendant about 9:17 a.m. on November 1, 2005, on the corner of Armstrong and South Main Street in the City of Lakeport. When he was talking with defendant, Officer Mendoza observed that defendant's head was shaved, he had a goatee beard, and a large tattoo of the word "Villain" across the back of his head. Defendant also had tattoos on the sides of his neck, "STV" on the right side and "LCS" on the left side. Defendant was wearing a thigh-length, dark blue denim jacket with a white thermal shirt, baggy blue jeans and white tennis shoes.

Officer Mendoza stated that he was dispatched to Bruno's Foods 40 minutes after he spoke with defendant. Bruno's Foods is about half a mile away from the location where Mendoza spoke with defendant. When he got to Bruno's Foods, Officer Mendoza spoke with Randy Shields. Shields "advised [Mendoza] that he had witnessed a male steal a bottled milk and some donuts. The subject left the store without declaring the items. He went outside and contacted the gentleman. They became verbal and confrontational. They tried to apprehend him and the subject turned around and fled. Based on his size and demeanor they did not pursue him. I was given a description of the subject which was jean jacket and a name tattooed across the subject's back of his head and tattoos down his neck." Shields could not tell Officer Mendoza what the tattoo on the back of defendant's head said, but said the tattoo "was lettering [and] was a name." The description Officer Mendoza received from Shields was consistent with his own observations of defendant half an hour earlier, including defendant's shaved head, tattoos and goatee beard, and after Officer Mendoza took the subject's description from Shields he "immediately recognize[d] him" to be defendant.

Officer Mendoza checked the area but was unable to find defendant, so he returned to the police station and put together a flyer with color photo of defendant. The photo was a frontal head-shot, and in it defendant's neck tattoos are not visible. The flyer contained a brief description of defendant (race [White], sex [male], height [six feet], weight [170], build [slender], complexion [clear], hair [brown] and eye color [green]). It also states in capital letters across the top: "Stone's head is shaven with 'Villain' tattooed on the back of his head." At the bottom, the flyer describes the clothes defendant was last seen wearing and adds that defendant has " 'LCS' and 'STV' tattooed on his neck."

When Officer Mendoza returned to Bruno's Foods about 2:00 p.m. that afternoon for followup he had the flyer with him on a clipboard because he was intending to go on from there to the Lake County Sheriff's Department to deliver the poster, "so they could put it in their briefing." When he reintroduced himself to Shields, Officer Mendoza had the clipboard in this hand. As the two walked towards the office, Shields saw the photo of defendant on the flyer and spontaneously exclaimed, "That's the guy." Officer Mendoza did not offer the photograph to Shields when this happened, nor did he show it to him and ask him to confirm if it was defendant in the photo. On cross-examination, Officer Mendoza explained it as follows: "The flyer that I had, I was not asking anybody to identify anybody. It was simply attached to my clipboard. I was not displaying it in a manner to get his attention to

identify that person. It's just kind of how it happened. So I was not showing the photograph or the flyer that I had put together for identification purposes like in a photo line-up."[2]

Detective Norman Taylor testified that on June 28, 2006, he contacted Randy Shields during his investigation of a shoplifting case on which Officer Mendoza had originally filed a report. He wanted to show Shields a lineup containing six photographs, one of which was of defendant. Detective Taylor orally admonished Shields before showing him the photos and Shields signed the admonition form. Among other things, the admonishment form advised that the viewer was not obliged to identify anyone, that it is just as important to free innocent persons from suspicion as it is to identify guilty persons, and that the viewer should not conclude or guess that the photos included the person who committed the crime. Detective Taylor stated that Shields pointed to defendant in photograph number 3 and said, "I think that's him."

In the photo lineup, defendant is the only one of the six shown wearing a V-necked T-shirt with broad, horizontal, black-and-white stripes. Detective Taylor stated that the striped T-shirt worn by defendant is issued to persons who are in custody at the Lake County jail. He stated that when he assembles a photo lineup, he normally focuses primarily on the physical characteristics of the people in the lineup and tries to make them as similar as possible. Also he tries to make sure nothing stands out "from one photograph to the next, whether that be the background or the light." In this case, Detective Taylor noted the background in all the photos is similar, all six photographs depict the subject against a height scale, and all the subjects in those photos are around six feet tall. Detective Taylor looked for a photo of defendant that did not depict him in a garment that had been issued by the county jail, but was unable to find one that he could use in a photo lineup. Others in the photo lineup are actually wearing jail clothing, he stated, but due to their classification are not in striped garb. None of defendant's tattoos are visible in the photograph. Detective Taylor stated that he was aware of one other individual in Lake County who had a tattoo on the back of his head similar to defendant's tattoo.

---

[2] On direct examination, the prosecutor showed Randy Shields the flyer, which was marked as defendant's exhibit A. Although Shields said he recognized the person on the flyer as defendant, he did not recall having seen the flyer before. Shields was also asked at the preliminary hearing on July 14, 2006, if he was ever shown a single photo of defendant. Shields stated he did not recall, and only remembered being shown a six-photo lineup.

DISCUSSION

A. *Ineffective Assistance of Counsel Claims**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Jury Instructions*

Defendant contends that the trial court erroneously instructed on the presumption of innocence and the prosecution's burden of proof, resulting in prejudicial structural error. We need not reach the issue of prejudice, because we conclude the trial court committed no instructional error.

The trial court instructed the jury before trial with Judicial Council of California Criminal Jury Instructions (2006–2007) CALCRIM No. 103, and after trial with CALCRIM No. 220. The instructions are identical except that CALCRIM No. 103 includes the bracketed language: "[I will now explain the presumption of innocence and the People's burden of proof. The defendant has pleaded not guilty to the charges.] The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

*(1)*

Defendant focuses on two phrases in the above instruction. First, he contends that the phrase "impartially compare and consider all the evidence" renders the instruction constitutionally infirm because it connotes the civil, preponderance standard of proof by implying "a weighing of *two* opposed sets of evidence—the proverbial balancing of the scales." Defendant reasons

---

*See footnote, *ante*, page 323.

that this undermines the presumption of innocence and lessens the prosecution's burden of proof because "if no contrary evidence were put into the defendant's [side] of the scale, the People would have sustained their burden of proof because it would obviously outweigh the absence of evidence on the other side."

Initially, we note that defendant did not object below when the trial court instructed the jury with CALCRIM Nos. 103 and 220. Accordingly, appellant has waived this claim of instructional error on appeal. (*People v. Bolin* (1998) 18 Cal.4th 297, 326 [75 Cal.Rptr.2d 412, 956 P.2d 374] [waiver found where defense counsel agreed to giving of instruction and raised no objection]; *People v. Jennings* (1991) 53 Cal.3d 334, 374 [279 Cal.Rptr. 780, 807 P.2d 1009] [failure to object to improper information presented to jury forfeits claims on appeal]; see also *People v. Vera* (1997) 15 Cal.4th 269, 275–276 [62 Cal.Rptr.2d 754, 934 P.2d 1279] [as a general rule, appellate court will not consider claims of error that could have been—but were not—raised in the trial court]; *People v. Viray* (2005) 134 Cal.App.4th 1186, 1209 [36 Cal.Rptr.3d 693] [where no objection is raised in trial court, evidentiary claim is waived even where defendant argued it affected his substantial rights].)

Even if preserved for review, we are not persuaded by defendant's exercise in semantics. In the first place, a jury instruction cannot be judged on the basis of one or two phrases plucked out of context: Rather, " ' " ' " [T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. . . ." ' " ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1202 [24 Cal.Rptr.3d 112, 105 P.3d 487] [citations omitted]; see *People v. Smithey* (1999) 20 Cal.4th 936, 963 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [same].) Moreover if a jury instruction appears ambiguous, " 'we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] . . . The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. (See *People v. Garceau* (1993) 6 Cal.4th 140, 189 [24 Cal.Rptr.2d 664, 862 P.2d 664] [any possibility of confusion about conspiracy instruction was diminished by the parties' closing arguments], disapproved on another ground in *People v. Yeoman* [(2003)] 31 Cal.4th [93,] 117–118; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146] [correct view of the law regarding mitigating factors in penalty phase trial was reinforced by the parties' closing arguments].)" (*People v. Young, supra*, 34 Cal.4th at p. 1202.)

Here, we cannot see how a jury would place enough significance on a single word—"compare"—such that it would interpret the instruction as a whole to mean that the evidence must only preponderate in favor of the prosecution in order to warrant a guilty verdict. The instruction simply tells the jury to "compare and consider *all the evidence* that was received throughout the entire trial." It does not instruct the jury to engage in any balancing of the evidence in the sense of comparing the evidence presented by one side against the evidence presented by the other side. Indeed, such an interpretation is completely inconsistent with the instructions as a whole. Elsewhere in the instruction the jury is told that "[t]he fact that a criminal charge has been filed against the defendant is not evidence that the charge is true" and that "[a] defendant in a criminal case is presumed to be innocent, [which] . . . requires that the People prove each element of a crime beyond a reasonable doubt." Further, the instruction tells the jury that "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The idea that the jury would interpret "compare" to mean that guilt is to be determined by a balancing-of-the-scales approach that compares the evidence offered by two sides is further undercut by other instructions. The jury was told that "[n]either side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant." The jury was also instructed that "defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt." In sum, reading the instructions as a whole, together with the fact that nowhere in closing arguments do counsel so much as allude to a preponderance standard, we are convinced that there is no likelihood whatsoever that the jury could have interpreted the "compare and contrast" language in the instruction in the manner suggested by defendant.

*(2)*

The second phrase defendant takes issue with in CALCRIM Nos. 103 and 220 is "abiding conviction" in the instruction's definition of proof beyond a reasonable doubt. Defendant contends this phrase renders the burden of proof instruction constitutionally infirm because it conflates the separate concepts of duration and weight. As defendant states it: "The phrase 'abiding conviction' conveys the idea of a determination that will last, but it cannot convey the idea of a conviction based [on] *weighty* evidence. The concept of proof beyond a reasonable doubt embodies the requirement of *gravity of* proof, not simply a decision that is lasting."

California's burden of proof instruction has been subjected to various challenges and changes over time. CALCRIM No. 220 replaced CALJIC No. 2.90, which also contained the "abiding conviction" language in defining reasonable doubt as follows: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an *abiding conviction* of the truth of the charge." (Italics added.)

Before 1994, CALJIC No. 2.90's definition of reasonable doubt included the phrase "to a moral certainty" after "abiding conviction" as follows: "It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." In *Victor v. Nebraska* (1994) 511 U.S. 1, 7 [127 L.Ed.2d 583, 114 S.Ct. 1239], the high court upheld this version of CALJIC No. 2.90, but criticized as archaic the instruction's use of the phrase "moral certainty," stating: "We do not think it reasonably likely that the jury understood the words 'moral certainty' either as suggesting a standard of proof lower than due process requires or as allowing conviction on factors other than the government's proof. At the same time, however, we do not condone the use of the phrase. As modern dictionary definitions of moral certainty attest, the common meaning of the phrase has changed since it was used in the *Webster* instruction, and it may continue to do so to the point that it conflicts with the *Winship*[8] standard. Indeed, the definitions of reasonable doubt most widely used in the federal courts do not contain any reference to moral certainty." (*Victor v. Nebraska, supra*, 511 U.S. at pp. 16–17.)

After *Victor v. Nebraska*, was decided, the California Supreme Court in *People v. Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249], recommended the use of a reasonable doubt instruction that deleted the phrase "to a moral certainty." The *Freeman* instruction thus defined reasonable doubt as follows: " 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' " (*People v. Freeman, supra*, 8 Cal.4th at p. 504, fn. 9.) The language of CALJIC No. 2.90 was then revised in 1994 in accordance with the California Supreme Court's suggestion in *Freeman*.

---

[8] *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068] [holding that the government must prove beyond a reasonable doubt every element of a charged offense].)

In short, the "abiding conviction" language criticized in CALCRIM No. 220 by defendant in this case can be traced directly to the instruction approved in *Freeman*, in which the Supreme Court explicitly sanctioned language defining reasonable doubt as " 'that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "[9] (*People v. Freeman, supra*, 8 Cal.4th at p. 504, fn. 9; see Bench Notes to CALCRIM No. 220, citing *People v. Freeman* as authority for the instruction.) Even if dictum, the Supreme Court's approval of the instruction is highly persuasive. (*Evans v. City of Bakersfield* (1994) 22 Cal.App.4th 321, 328 [27 Cal.Rptr.2d 406].) Moreover, the concept of an "abiding conviction" was also given a stamp of approval in *Victor v. Nebraska* where the high court stated: "Although in this respect moral certainty is ambiguous in the abstract, the rest of the instruction . . . lends content to the phrase. The jurors were told that they must have '*an abiding conviction*, to a moral certainty, of the truth of the charge.' . . . *An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof.* [Citations.]" (*Victor v. Nebraska, supra*, 511 U.S. at pp. 14–15, italics added.) Furthermore, numerous California cases since *Freeman* have rejected due process challenges mounted against the criminal burden of proof instruction with its "abiding conviction" language. (See, e.g., *People v. Miller* (1999) 69 Cal.App.4th 190, 213–214 [81 Cal.Rptr.2d 410]; *People v. Craig* (1998) 65 Cal.App.4th 1082, 1093 [83 Cal.Rptr.2d 1]; *People v. Gonzalez* (1998) 64 Cal.App.4th 432, 451 [75 Cal.Rptr.2d 272]; *People v. Cochran* (1998) 62 Cal.App.4th 826, 833 [73 Cal.Rptr.2d 257]; *People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1207–1209 [68 Cal.Rptr.2d 619]; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1451 [69 Cal.Rptr.2d 16]; *People v. Light* (1996) 44 Cal.App.4th 879, 887–889 [52 Cal.Rptr.2d 218].) Indeed, in *People v. Haynes* (1998) 61 Cal.App.4th 1282 [72 Cal.Rptr.2d 143], First District, Division Two of the Court of Appeal rejected substantially the same due process argument made by defendant in this case—that the term "abiding conviction" is "a standard for 'duration' but not the 'degree of certitude' jurors must have." (*Id.* at p. 1299.)

In sum, defendant's assertions on the deficiencies of the phrase "abiding conviction" must give way to the great weight of legal authority approving that very language. Accordingly, defendant's claims of instructional error must fail.

---

[9] Indeed, the same is true for the "compare and contrast" language discussed above in part *B.(1)* because *Freeman* uses an almost identical phrase for the jury's assessment of the evidence—" 'after the entire *comparison and consideration* of all the evidence.' " (*People v. Freeman, supra*, 8 Cal.4th at p. 504, fn. 9, italics added.)

## DISPOSITION

The judgment is affirmed in docket No. A116034 and defendant's petition for writ of habeas corpus in docket No. A117978 is denied.

Pollak, Acting P. J., and Siggins, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 21, 2008, S161990.