[No. C055464. Third Dist. May 6, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
DAWN AMBER GEMMILL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Under California Rules of Court, rules 8.1105 and 8.1110, only the first two introductory paragraphs on pages 960 and 961, the Factual and Procedural Background, part I of the Discussion, and the Disposition are certified for publication.

COUNSEL

Roberta L. Franklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ROBIE, J.**—Under the "emergency aid" exception to the warrant requirement, police officers may enter a home to render emergency assistance when they have an objectively reasonable basis to believe someone inside is seriously injured or imminently threatened with such injury. (*Brigham City v.*

*Stuart* (2006) 547 U.S. 398, 402–406 [164 L.Ed.2d 650, 657–659, 126 S.Ct. 1943].) In the published portion of this opinion, we are presented with a related question: may police officers conduct a search of a home that is less intrusive than the physical entry of the home when they have an objectively reasonable basis to *suspect* someone inside *might be* seriously injured or imminently threatened with such injury? Relying on reasoning from *Terry v. Ohio* (1968) 392 U.S. 1, 18-19, fn. 15 [20 L.Ed.2d 889, 903–904, 88 S.Ct. 1868], that "the scope of the particular intrusion, in light of all of the exigencies of the case, [is] a central element in the analysis of reasonableness," we conclude they may.

Defendant Dawn Amber Gemmill appeals after a jury found her guilty of two counts of misdemeanor child endangerment, one count of misdemeanor possession of marijuana, and one count of misdemeanor possession of more than 28.5 grams of marijuana. She challenges the denial of her motion to suppress, the denial of her motion for acquittal, and the adequacy of the trial court's description of fines, fees, and penalties imposed. We find no error in the trial court's denial of defendant's motion to suppress and motion for acquittal, but remand for the trial court to separately list, with the statutory basis, all fines, fees, and penalties imposed on each count.

## FACTUAL AND PROCEDURAL BACKGROUND

Deputy Jason Gassaway and Detective Suzanne Cobb picked up an unattended child wandering a Shasta Lake neighborhood in the summer of 2005. Information from neighbors, and the child's pointing, focused the officers' attention on a nearby house. Some time later, after Deputy Gassaway received no reply from his knocks and yells at the front door, he walked around the home until he came to a side window. From the window he saw an infant playing with a plastic bag near its face and a nonresponsive adult male.

Based on this information the officers entered the home without a warrant. While tending to the infant and the adult and looking for other unattended children, the police officers discovered over 550 grams of marijuana and methamphetamine paraphernalia, within a child's reach. The officers also observed and documented the clutter, dirtiness, and general disarray of the home. As it turned out, the home belonged to defendant, and she lived there with her two sons, ages two years and six months.

In an amended complaint, the People charged defendant with two counts of felony child endangerment, one count of possession of marijuana for sale (a

felony), and one count of possession of more than 28.5 grams of marijuana (a misdemeanor).[1] Defendant moved to suppress the evidence seized as a result of the officers' entry into the residence after looking through the side window of her home. The trial court denied the motion, finding the initial look through the side window lawful and the subsequent warrantless entry justified by exigent circumstances. The trial court emphasized the significance of no adult or older sibling emerging to look for the child found in the street and found it "quite reasonable for the deputy to then . . . check the house" "and then ma[k]e a perimeter." The trial court concluded there were "circumstances that permitted the officer to look into the window, and once he looked into the window, I think even [the] defense concedes the house had to be entered."

At the close of the People's case, defendant moved for acquittal on the child endangerment and possession of marijuana charges, but the trial court denied the motion, finding the People had produced substantial evidence to prove the elements of the crimes for which defendant was charged.

Defendant offered evidence that she had known the man found on the couch in her home since elementary school. He had occasionally stayed at the house during the several weeks prior to the incident. Defendant knew he smoked marijuana. He arrived at the home with his cousin early that morning, around 3:00 or 4:00 a.m., waking up defendant. Defendant knew the men had been drinking. The man and his cousin left the home later that morning, around the same time the older child's aunt arrived at the home. Defendant left the children at her home with the older child's aunt so defendant could go to the store. While defendant was out, the man found on the couch returned to the home. When defendant ran late, the aunt left the two children with the man the officers subsequently found lying nonresponsive on the couch.

A jury found defendant guilty of misdemeanor child endangerment for each child, misdemeanor possession of marijuana (as a lesser included offense of possession of marijuana for sale), and misdemeanor possession of more than 28.5 grams of marijuana. Since defendant was convicted of misdemeanors, there is no abstract of judgment and the sentencing proceedings were not reported.

---

[1] A charge of possession of methamphetamine was later dismissed for insufficient evidence.

## DISCUSSION

### I

### *Motion to Suppress*

The search at issue here is not Deputy Gassaway's entry of defendant's home based on what he saw in the side window, since defendant does not raise any issue about whether what the deputy saw gave him a sufficient basis to enter the home without a warrant. Rather, the issue defendant raises is whether Deputy Gassaway's look through the window was itself an unlawful search. Defendant contends the trial court erred by admitting evidence discovered as a result of Deputy Gassaway's look through her side window, arguing this act was a warrantless search not justified by exigent circumstances. We disagree, concluding that Deputy Gassaway's limited intrusion into defendant's home by looking through the side window was proportional to the nature of the exigency confronting him.

### A

### *Standard of Review*

"In reviewing the denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence. We then decide for ourselves what legal principles are relevant, independently apply them to the historical facts, and determine as a matter of law whether there has been an unreasonable search and/or seizure." (*People v. Miranda* (1993) 17 Cal.App.4th 917, 922 [21 Cal.Rptr.2d 785].)

### B

### *Deputy Gassaway Conducted a Limited Search of Defendant's Home by Looking Through the Side Window, but That Search Was Justified by a Reasonable Suspicion of an Emergency Inside*

1. *Warrantless Searches of the Home—General Principles*

"The Fourth Amendment provides '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable

searches and seizures, shall not be violated . . . .' [Citation.] This guarantee has been incorporated into the Fourteenth Amendment to the federal Constitution and is applicable to the states. [Citation.] A similar guarantee against unreasonable government searches is set forth in the state Constitution (Cal. Const., art. I, § 13) but, since voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard. [Citations.] 'Our state Constitution thus forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court.' " (*People v. Camacho* (2000) 23 Cal.4th 824, 829–830 [98 Cal.Rptr.2d 232, 3 P.3d 878].)

■ We ask two questions to determine the existence of a search: "First, did the defendant exhibit a subjective expectation of privacy? Second, is such an expectation objectively reasonable, that is, . . . one society is willing to recognize as reasonable?" (*People v. Camacho, supra,* 23 Cal.4th at pp. 830–831.)

■ The home has a special significance in Fourth Amendment jurisprudence. " '[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.' " (*People v. Camacho, supra,* 23 Cal.4th at p. 831.) Hence, "[i]t is a ' "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." ' " (*Brigham City v. Stuart, supra,* 547 U.S. at p. 403 [164 L.Ed.2d at p. 657].)

■ " '[W]arrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' " (*Brigham City v. Stuart, supra,* 547 U.S. at p. 403 [164 L.Ed.2d at p. 657].) Here, the most relevant exigency is the "emergency aid" exception to the warrant requirement: when police officers have an objectively reasonable basis for believing an occupant of a home is seriously injured or imminently threatened with such injury, the officers may enter the home without a warrant to render emergency assistance.[2]

---

[2] While we recognize California cases decided before 1982 are not binding to the extent they interpret our state Constitution's search and seizure clause more broadly than the federal Constitution (see *People v. Camacho, supra,* 23 Cal.4th at p. 830), our conclusion on the relevance of the emergency aid exception is informed, in part, by pre-1982 California precedent reasoning that "[e]ntry for the purpose of the protection of infant children must be justified on the same grounds as any other entry; there must be 'an imminent and substantial

(547 U.S. at pp. 403–406 [164 L.Ed.2d at pp. 658–659].) This principle does not directly control here, however, because (as noted above) the relevant intrusion was not the physical entry into the home, but Deputy Gassaway's look through the side window.

2. *Deputy Gassaway Searched Defendant's Home by Looking Through the Side Window While Standing in an Area Not Impliedly Accessible to the Public*

Defendant contends Deputy Gassaway conducted a search within the meaning of the Fourth Amendment when he walked around the perimeter of the home and looked through the side window. We agree.

After Deputy Gassaway heard no response from his knocks and yells at the front door, he walked around the right (north) side of the house, continuing to knock on the windows and announce his presence. There was no sidewalk but no fence either. It was not uncommon for people to walk by the north side of the house. People would walk to residences from the north side, and there was a "little wooded area kids play[ed] in." A bedroom window was open. He continued to knock and announce but heard nothing. Deputy Gassaway walked around the back of the house until he came to a window on its left (south) side. The blinds were closed, but there was a five to six inch gap in the slats. He could see inside the living room, where he saw the situation that led him to enter the house without a warrant.

■ It is reasonable to expect privacy in the home; this includes side windows not accessed by parts of the yard to which the public is expressly or impliedly invited. (*Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 638 [108 Cal.Rptr. 585, 511 P.2d 33].) In *Lorenzana*, police officers received a tip that drug dealing was taking place at Lorenzana's address and discovered evidence of drug dealing by looking through a side window without a warrant, leading to convictions of those in the house. (*Id.* at pp. 629–631.) The facts of *Lorenzana* are instructive: "The dwelling at the designated address, a single family house, was set back about 70 feet from the sidewalk. The front door to this dwelling did not face the public street on the north, but instead was on the west side of the building. A rear door opened on the south side. Officer Myers testified that access to the house was from the west. There were no doors or defined pathways on the east side of the house, and a strip of land covered with grass and dirt approximately six to ten feet in width separated

threat to life, health, or property.' " (*People v. Sutton* (1976) 65 Cal.App.3d 341, 352 [134 Cal.Rptr. 921].) We believe this principle comports with federal Fourth Amendment jurisprudence.

the east side of the dwelling from an adjacent apartment driveway. [¶] Upon arriving at the address, Sergeant Myers circled behind the apartment, walked down the adjacent driveway, crossed onto the strip of petitioner Lorenzana's property, and positioned himself at a window on the east side of the house. The window had been fully closed. The window glass was intact. The window shade had been drawn, but a gap of about two inches had been left between the window sill and the bottom of the shade. Gaps of about one inch or so had been left on each side of the shade, but a thin curtain also hung down on the sides of the window. [¶] Sergeant Myers testified that he had trespassed onto petitioner Lorenzana's property because he could not see into the house from the adjacent driveway or from the street. In fact, he could not see into the dwelling until he was within five or six inches of the window. The officer further testified that he knew that the property onto which he trespassed was not a common-use area but belonged to the dwelling . . . . Sergeant Myers did not have permission to go upon the property." (*Id.* at p. 630.) No substantial evidence supported an implied invitation to be on the east side of the house where the officer looked through the window. (*Id.* at p. 636.) The court rejected the argument that openings in the window somehow reduced the expectation of privacy, reasoning that "by drawing the window shade petitioner Lorenzana exhibited a reasonable expectation to be free from surveillance conducted from a vantage point in the surrounding property not open to public or common use." (*Ibid.*) The court set aside the trial court's denial of the petitioners' motions to suppress. (*Id.* at pp. 640–641.)

As to whether defendant here had a reasonable expectation of privacy in the side window on the south side of her home, we find *Lorenzana* controlling. Like the officer in *Lorenzana*, Deputy Gassaway circled around the perimeter of defendant's home. (See *Lorenzana v. Superior Court, supra*, 9 Cal.3d at p. 630.) Similarly, no substantial evidence in the record supports the conclusion that the southeast corner of defendant's home was impliedly accessible to the public. (See *id.* at pp. 630–631.) While Deputy Gassaway testified that the north side of defendant's home was "a little wooded area that kids play in" and "likely that people walk through a lot" to reach other houses, this testimony provides no substantial evidentiary basis for inferring that the *south* side of defendant's house was an impliedly open access route as well. (See *id.* at pp. 636, 638.) Finally, just as in *Lorenzana*, Deputy Gassaway looked through a side window of defendant's home by peering through a crack in otherwise closed blinds. (See *id.* at pp. 630–631.) Finding the relevant facts indistinguishable from *Lorenzana*, we conclude that defendant exhibited a reasonable expectation of privacy within the scope of the Fourth Amendment.

### 3. *Deputy Gassaway's Look Through the Side Window Was a Less Intrusive Search Justified by a Lesser Degree of Certainty That an Emergency Existed*

Defendant contends Deputy Gassaway's look through the side window of her home was not justified by exigent circumstances. We disagree. Reviewing the relevant case law, we conclude that the presence of the unattended child, combined with the lack of information regarding whether there were siblings or others in the house, was sufficient to justify Deputy Gassaway's less intrusive look through defendant's side window to determine if an emergency existed inside.

This issue demands a more detailed description of the relevant facts produced at the suppression hearing. In late June 2005, a man who was driving his car nearly hit a child who was standing in the road. Around 10:30 a.m. the man called the sheriff's department. Deputy Gassaway and another officer responded to the call. A neighbor told the officers the child lived at a home near where the child was found. The child was unable to give more information. No vehicles were parked in front of the residence. Deputy Gassaway knocked hard on the door of the house the neighbor indicated but no one answered. At the time he did not believe exigent circumstances justified entering the home. Deputy Gassaway joined the other officer and the child at the substation shortly thereafter. After he left the home he "realized . . . [he] should have checked the entire perimeter."

Back at the substation, Deputy Gassaway had a "gut feeling" that something "didn't seem right" about the situation. He was concerned there could be another child in the residence. At this point the child found in the street was with Shasta County Child Protective Services, but child protective services did not provide Deputy Gassaway with any information about whether the child had siblings. Deputy Gassaway returned back to the house at 12:15 p.m. because he was "worried there could be a kid in the residence still."

There were still no vehicles in front of the residence. Again he banged loudly on the front door. He yelled "Sheriff's Office" several times. There was no answer. He could not see through the front window on the porch because the blinds were shut. On the basis of this information, Deputy Gassaway walked around the perimeter of the home and looked through the side window from an area to which the public was not impliedly invited.

We turn now to the relevant case law. When an officer finds an unattended child but should know no one is inside the child's home, an exigency does not justify warrantless entry of that home. (*People v. Smith* (1972) 7 Cal.3d 282, 286–288 [101 Cal.Rptr. 893, 496 P.2d 1261].) In *Smith*, a six-year-old child was alone in an apartment but did not want to stay there alone any longer. The child was outside the apartment in the late afternoon and the landlord took her in. (*Id.* at p. 284.) The landlord called the police shortly thereafter. (*Ibid.*) The child told the dispatched officer she had been left alone in her apartment and her mother was not there. (*Ibid.*) After the brief conversation with the child, the officer knocked on the child's apartment door but no one answered. (*Ibid.*) The officer then had the landlord unlock the child's apartment and made a warrantless entry. (*Ibid.*) The officer "explained that he demanded entry because '[he] wanted to find out if [the mother] was there, if she could take care of her daughter, and if she may need any help.' " (*Id.* at p. 286.) To the court, the issue was not merely whether the officer's conduct "might have been 'reasonable' under all the circumstances," but whether his entry into the home was "within one of the 'few specifically established and well-delineated exceptions' to the warrant requirement. [Citations.] Among those exceptions is the emergency doctrine. [Citation.] But the exception must not be permitted to swallow the rule: in the absence of a showing of true necessity—that is, an imminent and substantial threat to life, health, or property—the constitutionally guaranteed right to privacy must prevail." (*Ibid.*) The court found only irrational speculation could lead the officer to the belief an emergency existed in the home and thus concluded the warrantless entry was unjustified. (*Id.* at p. 287.)

But some California appellate courts have found exigencies under similar circumstances. In *Miller*, a police officer responded to a call from concerned neighbors about a small child wandering the neighborhood crying for his mother. (*People v. Miller* (1999) 69 Cal.App.4th 190, 196–199 [81 Cal.Rptr.2d 410].) Neighbors told the officer that on at least one occasion the child had been found wandering unsupervised when his parents were home and that other siblings lived at the residence. (*Id.* at p. 199.) When the officer approached the front door it was partially cracked open, "indicating that someone might be inside," but no one responded when he knocked and announced. (*Id.* at pp. 199–200.) The court concluded exigent circumstances justified the officer's warrantless entry into the home. (*Id.* at p. 200.)

The court in *Miller* based much of its reasoning on *In re Dawn O.* (1976) 58 Cal.App.3d 160 [128 Cal.Rptr. 852]. (*People v. Miller, supra*, 69 Cal.App.4th at pp. 198–199.) In *In re Dawn O.*, a little girl was taken in by her friend's mother for the afternoon after being locked out of her apartment. (*In re Dawn O., supra*, 58 Cal.App.3d at pp. 162–163.) The friend's mother notified

the juvenile authorities later that night, at which point an officer took the little girl back to her apartment. (*Id.* at pp. 162–164.) While talking with the little girl, the officer learned she had a sister. (*Id.* at p. 162.) The officer knocked on the door several times but received no response. (*Id.* at p. 163.) The little girl pointed out another door through which the officer made a warrantless entry of the apartment. (*Ibid.*) The court distinguished the case from *Smith*, finding from facts available to the officer that "the sister might still [have] be[en] in the apartment unattended, as indeed she and another sister were." (*Dawn O.*, at pp. 163–164.) The court reasoned that unlike the officer in *Smith*, who "knew no one was home, because he was so told by the child[, there] the officers had no knowledge if anyone was home; and if a child should be there, they did not know what the conditions were for its safety and welfare." (*Dawn O.*, at p. 164.) The court therefore found exigent circumstances justified the officer's warrantless entry into the apartment. (*Ibid.*)

The People make a comparable argument here, contending "[t]he exigency here was that, while the boy himself was out of danger by the time the officers went back to the house, the fact that he had been allowed to wander into the street, that no one had come forward to report the child missing, no one was out looking for the child around the house and no one responded when the officer shouted and loudly knocked on the door and walls, all suggested that an incapacitated person, or possibly another endangered child, was inside the house where the child lived."

Deputy Gassaway had less information than the officers in *Smith*, *Miller*, or *Dawn O.* Unlike the child in *Smith*, the unattended child Deputy Gassaway picked up could not tell him where he lived or if other adults or children were—or were not—in his home. (See *People v. Smith, supra*, 7 Cal.3d at p. 284.) The information available to the officer in *Smith* reasonably dispelled any suspicion of an emergency inside the child's house. (*Id.* at p. 287.) Deputy Gassaway's lack of such information preserved a reasonable suspicion that something inside the child's house could be awry. In contrast to the officers in *Miller* and *Dawn O.*, Deputy Gassaway had no information sufficient to reasonably conclude the child did—or did not—have siblings. (See *People v. Miller, supra*, 69 Cal.App.4th at p. 199; *In re Dawn O., supra*, 58 Cal.App.3d at p. 162.) The information available to Deputy Gassaway did more than merely provide a basis to irrationally speculate someone might need emergency aid inside the child's home, as in *Smith*. (See *People v. Smith, supra*, 7 Cal.3d at p. 287.) But neither was the information sufficient to raise a reasonable belief someone inside was seriously injured or imminently threatened with such injury, as in *Brigham City*, *Miller*, and *Dawn O.* (See

*Brigham City v. Stuart, supra,* 547 U.S at pp. 405–406 [164 L.Ed.2d at p. 659]; *People v. Miller, supra,* 69 Cal.App.4th at p. 199; *In re Dawn O., supra,* 58 Cal.App.3d at pp. 162–163.)

This case lies somewhere in between. The question, then, is whether Deputy Gassaway could—after finding an unattended child—search defendant's home by looking through a side window not impliedly accessible to the public when the information available to him was sufficient to support a reasonable suspicion that someone inside might be seriously injured or imminently threatened with such injury, but insufficient to support a reasonable belief that someone inside was seriously injured or threatened with such injury. We conclude the answer is "yes" and therefore the search was lawful.

■ The People contend "[t]he exigent circumstances doctrine, typically applie[s] to the *entry* of private premises . . . . The issue here, however, involves far less intrusive conduct: looking through a window while conducting a perimeter examination of the house in an effort to locate a parent or other person responsible for the care of the young boy found wandering unattended in the middle of a busy street." We agree with the People that the degree of intrusion a warrantless search entails in a particular case should inform our determination of whether the search was justified by exigent circumstances. (See *Terry v. Ohio, supra,* 392 U.S. at pp. 18–19, fn. 15 [20 L.Ed.2d at pp. 903–904] ["In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness."].)

In adopting the emergency aid doctrine, the United States Supreme Court concluded "police may *enter a home* without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." (*Brigham City v. Stuart, supra,* 547 U.S at p. 400 [164 L.Ed.2d at p. 656], italics added.) Similarly, in *Smith, Miller,* and *Dawn O.,* California courts concluded an officer may *enter a home* if the officer reasonably believes an imminent and substantial threat to life, health, or property is within. (See *People v. Smith, supra,* 7 Cal.3d at p. 286; *People v. Miller, supra,* 69 Cal.App.4th at p. 198; *Dawn O., supra,* 58 Cal.App.3d at p. 162.)

Here, in contrast, Deputy Gassaway's initial search was far less intrusive than a physical entry of the home. Deputy Gassaway did not enter defendant's home until after seeing a child inside threatened with suffocation next to

a nonresponsive adult. Deputy Gassaway obtained this information by conducting a warrantless search, specifically, by looking through a small opening in the slats of a window's closed blinds. While Deputy Gassaway's search intruded into an area over which defendant had a reasonable expectation of privacy, it was much less invasive than a physical entry into defendant's home.

■ The scope of Deputy Gassaway's search was proportional to the exigency before him. (See *Terry v. Ohio, supra*, 392 U.S. at pp. 18–19, fn. 15 [20 L.Ed.2d at pp. 903–904].) Upon finding the child and receiving no answer when he knocked on the front door the first time, Deputy Gassaway testified exigent circumstances did not justify entry into the home but he should have "checked the entire perimeter." A reasonable suspicion that an incapacitated adult or another unattended child might have been in defendant's home was an exigency that required immediate action. Deputy Gassaway's "gut feeling" that he should have checked the perimeter the first time he was at the home was compounded when he returned, knocked on the door, and again received no answer. The hour that passed before Deputy Gassaway looked through the side window did not dissolve the exigency since no new information dispelled the reasonable suspicion someone might have needed help inside defendant's home. While a reasonable belief someone inside a home is seriously injured or imminently threatened with such injury justifies entry into the home to render aid, a reasonable suspicion someone inside a home may be seriously injured or imminently threatened with such injury justifies a more limited search to confirm or dispel the suspicion. (See *Brigham City v. Stuart, supra*, 547 U.S at pp. 403–406 [164 L.Ed.2d at pp. 658–659]; *Terry v. Ohio, supra*, 392 U.S. at pp. 18–19, fn. 15 [20 L.Ed.2d at pp. 903–904].) Deputy Gassaway lawfully conducted this kind of limited search by looking through defendant's side window based on such a reasonable suspicion.

We thus conclude the warrantless search of defendant's home was justified by exigent circumstances. The trial court therefore correctly denied defendant's motion to suppress.

II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 958.

## DISPOSITION

The judgment of conviction is affirmed, but the case is remanded to the trial court to separately list, with statutory basis, all fines, fees, and penalties imposed on each count.

Davis, Acting P. J., and Butz, J., concurred.

On May 9, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 13, 2008, S164234.