Filed 7/24/13  P. v. Fazzio CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C071526 |
| Plaintiff and Respondent, | (Super. Ct. No. SF114140A) |
| v. | |
| ANDREW FAZZIO, | |
| Defendant and Appellant. | |

At the core of this case is the common law maxim that " '[a] man's home is his castle.' "  (*Minnesota v. Carter* (1998) 525 U.S. 83, 94 [142 L.Ed.2d 373, 383], italics omitted.)  Stockton Police Officer David Wells testified that he arrived at the county hospital and spoke with a paramedic who had "responded to a residence for an infant [who] had some medical problems . . . ."  The paramedic expressed concerns over a male who was watching the remaining children.  The children's mother arrived at the hospital, and after speaking with her in the emergency room, Officer Wells grew concerned over the male who was watching the children.  As a result, Officer Wells went to the house

1

without the mother.  After the male let Officer Wells into the house, the male eventually admitted that marijuana was growing there.  Although Officer Wells did not obtain a warrant, a search of the house yielded two guns and ammunition.

Based on the evidence found in the search, defendant Andrew Fazzio was convicted of two counts of being a felon in possession of a firearm and one count of being a felon in possession of ammunition.  Defendant moved to suppress as the fruits of an illegal search the physical evidence and verbal statements obtained after Officer Wells entered his house, but the magistrate (Judge James E. Hammerstone, Jr.) denied his motion.  On appeal, defendant contends the magistrate erred in denying his suppression motion.  We agree and therefore reverse.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2010, Officer Wells arrived at the county hospital in response to a complaint made by Matt Venema, a paramedic who had taken a medically distressed child from a residence to the hospital.  After Officer Wells arrived at the hospital, he spoke with Venema.  Venema thought it was odd that a male babysitter at the residence knew "nothing about the child's medical history, date of birth . . . and had no way of contacting the parents to receive that information."  He also noted that the man had tattoos.

Sometime after, the mother of the ill child, Renee Streeter, arrived at the hospital.  Officer Wells spoke with Streeter and asked her questions about the man who was caring for the children at her house.  According to Officer Wells, Streeter told him the man's name was David and he was a relative.  She also explained that David was babysitting her three children that day because the regular daycare provider was unavailable.  She did not, however, know David's full name.

Officer Wells grew concerned over David's unfamiliarity with the children's medical history and birth dates and Streeter's inability to recall David's last name.  He explained his concerns to Streeter.  Although Officer Wells examined the child at the

2

emergency room and the child showed no signs of abuse or mistreatment, he told Streeter he wanted to go to the house and check on the welfare of her other two children.  Streeter responded by saying, "we'll go check on them."

Officer Wells, however, went to Streeter's home without her.  After he knocked on the door, a male who fit Venema's description of the babysitter answered the door and identified himself as David.  Like Venema, Officer Wells noticed the man had tattoos.  The man was later identified as David Castro.

Castro explained to Officer Wells what had happened with the ill child.  Castro stated that Streeter left the children with him when she went to work.  She told Castro that one of the children was sick.  At some point when the three children were in Castro's care, one of them was "choking and was going in and out of sleep spells . . . ."  Castro went to the next-door neighbor's house to call for emergency response.  After paramedics arrived and treated the child, Castro stayed behind with the other two children.  Like Venema told Officer Wells, David was unable to provide Officer Wells with the children's dates of birth or medical history.

Officer Wells informed Castro that he wanted to come in and check on the welfare of the other two children.  In response, Castro told Officer Wells he was on parole and asked Officer Wells whether he was in trouble; Castro appeared nervous.  Officer Wells "assured him as long as [he] could come in and check on the children, there was . . . no reason for him to be nervous . . . ."  After this discussion, Castro invited Officer Wells in.

Officer Wells first identified a six-year-old child on the couch in the living room.  She appeared to him to be "healthy and happy, and there were no signs of . . . abuse or mistreatment . . . ."  Castro and Officer Wells went upstairs together to check on the second child, who was sleeping.

Once upstairs, Officer Wells checked on the second child, who did not show signs of "abuse or mistreatment."  However, Officer Wells noted "[s]poiled food on the ground, along with . . . small toys . . . .  The floor was covered with stuff."

3

When leaving the child's room, he saw a room directly in front of him with a "bright light coming from underneath the door . . . ." He recognized the light as consistent with those he had seen in "marijuana grow houses." Officer Wells also heard what sounded like a fan; he put his ear to the door to confirm the sound.

Officer Wells asked Castro if there was marijuana in the room. Again, Castro appeared nervous and Officer Wells "reassured him that . . . at [that] time [Castro] really wasn't in trouble; [Officer Wells] just wanted to check the safety o[f] the kids . . . ." Castro then admitted that he knew marijuana was in the room.

Because he was concerned for his own safety, Officer Wells detained Castro and patted him down for weapons. Two additional units arrived. According to Officer Wells, at no point during the conversation at the home did Castro appear threatening.

After Castro was placed in handcuffs, Officer Wells decided it was appropriate to conduct a protective sweep of the house to ensure there was no one else there. While clearing the master bedroom, Officer Wells checked a closet where he found a bulletproof vest, ammunition, and a holster.

While Officer Wells was clearing the house, Streeter returned home. Officer Wells spoke with her and she indicated defendant lived there. According to Officer Wells, she suggested defendant had been arrested for narcotics and might have served prison time. Officer Wells told Streeter that the state of the child's room, presence of guns, and the marijuana grow made him concerned for the safety of the children. Streeter responded that she had a marijuana grow card and that defendant "doses her."

After they spoke for a while, Streeter "eventually gave [him] permission to search the house." A subsequent search of the master bedroom yielded a gun under the mattress and a "large amount of money in a drawer of a dresser in the bedroom." The search did not include the locked room containing marijuana because Streeter did not have a key.

After the search, Officer Wells learned defendant was a felon who could not own a firearm. Officer Wells went to the hospital, where defendant was with his child, and

4

arrested him. Defendant confirmed he was a convicted felon and identified the gun seized by Officer Wells as his own. With the permission of defendant, Officer Wells went back to defendant's house to look for another gun.

Defendant was charged with two counts of possession of a firearm by a felon, three counts of possession of ammunition by a felon, and one count of receiving stolen property. He was also alleged to have a prior serious felony and a prior conviction.

Defendant moved to suppress all evidence as the fruits of an unconstitutional search. The magistrate denied the motion to suppress. The magistrate explained his decision as follows:

"All right [*sic*]. It comes down to a credibility call. And I'm going to come down on Officer Wells'[s] behalf. For example, in Ms. Streeter's testimony, she said she wasn't aware the defendant was a felon, just that he, quote, 'had a past.' And she didn't know that he couldn't have guns, yet the gun she says isn't hers and she doesn't know how it's supposed to be there. That just doesn't wash.

"So I'll find that there was consent. And the motion to suppress . . . is hereby denied.

"[¶] . . . [¶]

"I'll also find that it was an exigent circumstance in light of the fact that Ms. Streeter's son was apparently in such distress that the babysitter David went next door to the neighbor and called for an ambulance, and that it's the ambulance attendant that first brings the situation to Officer Wells's attention. And I think Officer Wells, at that particular point in time, under the circumstances of this case, it was incumbent upon him to get in there and check the children. Being able to do that, one matter would have led to the other. So it's denied."

After a trial to the court (Judge Seth R. Hoyt, Jr.), defendant was convicted of both counts of possession of a firearm by a felon and one count of possession of ammunition by a felon. He filed a timely notice of appeal.

5

DISCUSSION

I

*Arguments on Appeal*

On appeal, defendant claims the magistrate 's "[d]enial of [his] motion to suppress was reversible error." His first claim is that the "trial court erred in finding that the warrantless search of [his] home was lawful due to exigent circumstances" because neither the community caretaker exception, nor an emergency law enforcement situation justified Officer Wells's warrantless entry. Also, defendant claims: "The trial court erred in finding that valid consent had been given to search [his] home" because: (1) Castro did not have authority to consent; (2) Streeter's subsequent consent at the home was involuntary; (3) defendant's consent to search his home was involuntary; and (4) Castro's prior consent as a probationer was insufficient to justify the search.

II

*Standard of Review*

"In ruling on a suppression motion, 'the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] . . . [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, viz., the reasonableness of the challenged police conduct, is also subject to independent review. [Citations.] The reason is plain: "[I]t is 'the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' " ' " (*People v. Wilkinson* (2008) 163 Cal.App.4th 1554, 1562.)

6

" 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court.  On appeal all presumptions favor proper exercise of that power, and the trial court's findings -- whether express or implied -- must be upheld if supported by substantial evidence.' " (*People v. James* (1977) 19 Cal.3d 99, 107.)

### III

### *Officer Wells's Warrantless Entry into Defendant's Home Violated*
### *Defendant's Fourth Amendment Right Against Unreasonable Searches*

The Constitutions of both the United States and California proscribe unreasonable searches and seizures.  (See U.S. Const, 4th Amend.; Cal. Const., art. I, § 13.)  " '[S]ince voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard.  [Citations.]  "Our state Constitution thus forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court." ' " (*People v. Gemmill* (2008) 162 Cal.App.4th 958, 964.)  The basic rule is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." (*Katz v. United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585], fn. omitted.)

### A

### *Exigent Circumstances Did Not Justify Officer Wells's*
### *Warrantless Entry into Defendant's Home*

Defendant's first argument is that the trial court erred in finding exigent circumstances justified Officer Wells's entry.  First, he argues that "there was not substantial evidence to support the trial court's conclusion that the police officer was facing an emergency situation that required immediate action."  Second, because an

officer must have "probable cause that the place to be searched contained the evidence or suspects the police were seeking," and there "were no facts before the trial court that the police officer was in pursuit of a criminal or searching for evidence related to a crime," "it was error to find that the Fourth Amendment protections were excused in [defendant's] case."[1]

The People contend that defendant is incorrect because "exigent circumstances entry is in fact justified where there is probable cause to believe an imminent threat exists to the life or welfare of someone inside a residence."[2] They go on to state the "trial court found -- inter alia -- Officer Wells'[s] warrantless entry was justified because the facts available to him at the time made that entry objectively reasonable." We disagree with the People.

"[A]lthough 'searches and seizures inside a home without a warrant are presumptively unreasonable,' [citation], that presumption can be overcome. For example, 'the exigencies of the situation [may] make the needs of law enforcement so

---

[1] There is no evidence that Castro or Streeter engaged in any sort of criminal activity prior to Officer Wells's initial entry in the home. Thus, we agree that Officer Wells did not have probable cause to believe that there was evidence of a crime inside defendant's home, or a felon was inside defendant's home. (See *People v. Ormonde* (2006) 143 Cal.App.4th 282, 291 [" ' the few "specifically established and well-delineated exceptions" to the warrant requirement [citation], [include exigent circumstances] such as " 'hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape . . . " ' "]; see also *Illinois v. Gates* (1983) 462 U.S. 213, 238-239 [27 L.Ed.2d 527, 548] [probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed"].)

[2] Because an officer needs only a reasonable belief that an individual is injured or in imminent danger to justify a warrantless entry under the emergency aid doctrine, the People curiously overstate the appropriate standard as probable cause. (See *People v. Troyer* (2011) 51 Cal.4th 599, 606 cert. den. (Oct. 3, 2011) (*Troyer*) ["the exception 'requires only "an objectively reasonable basis for believing . . ." [citation] that "a person within [the house] is in need of immediate aid" ' "].)

8

compelling that the warrantless search is objectively reasonable.' " (*Michigan v. Fisher* (2009) 558 U.S. 45, 47 [175 L.Ed.2d 410, 413].) However, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches . . . ." (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 749-750 [80 L.Ed.2d 732, 743].)

One type of exigency is covered by the emergency aid doctrine. (See *Michigan v. Fisher*, *supra*, 558 U.S. at p. 47 [175 L.E.2.d at p. 413].) " ' "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' " (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 657-658].)

Our Supreme Court most recently explained the emergency aid doctrine in *Troyer* as follows: " '[P]olice may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.' . . . ' " 'There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " ' " (*Troyer*, *supra*, 51 Cal.4th at p. 606.)

"The ' "emergency aid exception" ' to the warrant requirement 'does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.' [Citation.] Rather, the exception 'requires only "an objectively reasonable basis for believing . . ." [citation] that "a person within [the house] is in need of immediate aid." ' [Citation.] 'We are to approach the Fourth Amendment . . . with at least some measure of pragmatism. If there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way.' " (*Troyer*, *supra*, 51 Cal.4th at p. 606.)

In *Troyer* officers responded to an emergency call that an unidentified male had possibly been shot twice. (*Troyer*, *supra*, 51 Cal.4th at p. 603.) When they arrived, the

9

officers "approached the front porch of the residence, where a 40-year-old white male was administering first aid to a female victim . . . who had been shot multiple times." (*Ibid.*) They also encountered another male, Abeyta, who was bleeding from his head, had blood on his shirt, and was visibly agitated. (*Ibid.*)

The victim told the officer that two males were responsible for the shooting and had fled in a vehicle. (*Troyer*, *supra*, 51 Cal.4th at p. 603.) An officer noted blood marks on the front door of the house, including the area near the handle. (*Ibid.*) The officer asked Abeyta if there was someone in the house several times, but Abeyta's answers were inconsistent. (*Ibid.*)

The officer described the situation as chaotic -- the shooting victim was screaming and Abeyta was visibly agitated. (*Troyer*, *supra*, 51 Cal.4th at p. 603.) The officer "could not focus on whether there were any sounds coming from inside the residence. Under these circumstances, [the officer] decided that he had a responsibility to verify whether there were additional victims or suspects in the house." (*Id.* at pp. 603-604.) As a result, the officer proceeded into the house and a search eventually yielded contraband in a locked room. (*Id.* at p. 604.)

The court held that the officers had a reasonable belief that "one or more shooting victims could be inside the house." (*Troyer*, *supra*, 51 Cal.4th at p. 607.) The court first reasoned that after responding to a reported gunshot, "[b]loodstains on the door signaled that a bleeding victim had come into contact with the door, either by entering or by exiting the residence." (*Ibid.*) The court also noted that the dispatch report provided that a male had possibly been shot twice. (*Id.* at 608.) Although the police found Abeyta at the scene with a wound to his head, "the officer never stated that he observed any gunshot wounds on Abeyta or that he had concluded Abeyta must have been the man described in the dispatch report." (*Ibid.*)

Last, "Sergeant Albright asked Abeyta whether there was anyone inside the residence, but Abeyta's inconsistent answers raised serious concerns about his ability to

10

give accurate and reliable responses. [Citations.] The first time Albright asked whether anyone was inside the house, Abeyta just stared at Albright for 15 to 20 seconds and failed to respond. The second time, Abeyta continued to stare at the officer and eventually said he 'did not think so.' The third time, Abeyta paused for a 'long' time, stared at the officer, and then said 'no.' Because the window blinds were closed, Albright could not peek inside to verify whether Abeyta's final answer was the correct one, nor, given the chaos at the scene, could he hear whether any sounds were coming from inside the residence. Under these circumstances, and inasmuch as Albright did not know who lived at the residence or who had been the aggressor, an objectively reasonable basis existed to enter the residence to search for additional victims." (*Troyer*, *supra*, 51 Cal.4th at pp. 608-609.)

The case here, however, is distinguishable from *Troyer*. First, in *Troyer* blood on the threshold to the house suggested that someone was possibly injured inside, here there was no evidence that one of the children remaining in the house with Castro was injured. Given that Officer Wells affirmed on cross-examination that he "didn't notice any sort of signs of any kind of abuse or mistreatment" on the child at the hospital, there was no evidence that Castro posed any sort of danger to the children remaining in the house.

This case can be further distinguished from *Troyer* in that Officer Wells's investigation did not yield conflicting testimony that might have suggested a child was injured inside the house. Whereas the testimony of Abeyta in *Troyer* was equivocal as to whether any one was injured inside the house, here Streeter and Castro's explanation for why he was babysitting and the source of the child's illness were identical. When Officer Wells spoke to Streeter at the hospital, she told him that the man was a family member of her husband, that his name was David, and that he was filling in for the normal childcare provider. When Officer Wells spoke to Castro at the house, Castro informed Officer Wells he was on probation, and he was nervous. Castro, however, also *corroborated* Streeter's testimony: he confirmed that his first name was David and that the mother left

11

the children with him while she was at work. More importantly, the only *new* evidence Officer Wells unearthed from Castro was that the child was sick before Castro got there, and Castro, after noticing the child was "choking and was going in and out of sleep spells," proceeded to the neighbor's house to call for medical response. Because all Officer Wells knew was that a tattooed male replacement babysitter, who did not know the medical history of the children, called the paramedics when a sick child appeared to became more seriously ill, we cannot say that there existed "an objectively reasonable basis . . . [for Officer Wells] to enter the residence to search for additional [sick or injured children]." (*Troyer*, *supra*, 51 Cal.4th at p. 609.)

On the contrary, we conclude that it was not reasonable for Officer Wells to believe that the two other children reportedly in the house were injured or in imminent danger. An emergency circumstance justifies entry only when "the police reasonably believe an emergency exists which calls for an *immediate response* to protect citizens from *imminent danger* . . . ." (*United States v. Holloway* (11th Cir. 2002) 290 F.3d 1331, 1337, italics added.) Considering the child at the hospital showed no physical signs of abuse or neglect, there was no basis to infer, for example, that Castro was physically abusive to the child. Because there was no evidence linking Castro with the child's illness, nor evidence that Castro was a threat to the remaining children's safety, there was no basis for reasonably concluding that Castro posed any serious danger to the two remaining children such that Officer Wells needed to immediately enter the home and check on them. (*Ibid.*; see also *Brigham City v. Stuart*, *supra*, 547 U.S. at p. 406 [164 L.Ed.2d at p. 659] [finding "an objectively reasonable basis for believing . . . that [an] injured adult might need help" where the police saw a juvenile punch an adult and the adult spit blood ]; *Tamborino v. Superior Court* (1986) 41 Cal.3d 919, 924 [finding "that the *discovery* of one *wounded victim* afforded reasonable cause to enter and briefly search for additional victims" where the police received a call that a residence had been robbed and someone was injured inside], italics added.)

12

While we do not doubt that Officer Wells was truly concerned for the safety of the two children who reportedly remained in the home, that concern alone does not justify his warrantless entry. Indeed, while the "solicitude of [Officer Wells] for the [children's] safety and welfare was of course commendable . . . [he] must also be concerned with the interest of [their] parent[s] in the security and privacy of [their] home, an interest expressly protected by constitutional command. [Citation.] The issue, therefore, is not simply whether the conduct of Officer [Wells] might have been 'reasonable' under all the circumstances, but whether the People have shown that his entry into [defendant's] home falls within one of the 'few specifically established and well-delineated exceptions' to the warrant requirement. [Citations.] Among those exceptions is the emergency doctrine. [Citation.] But the exception must not be permitted to swallow the rule: in the absence of a showing of true necessity -- that is, an imminent and substantial threat to life, health, or property -- the constitutionally guaranteed right to privacy must prevail." (*People v. Smith* (1972) 7 Cal.3d 282, 285-286.)

Accordingly, we hold that exigent circumstances did not justify Officer Wells's warrantless entry into defendant's home.

B

*Consent Was Not a Valid Justification For Officer*

*Wells's Warrantless Entry into Defendant's Home*

"To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, [citations] one 'jealously and carefully drawn' exception, [citations] recognizes the validity of searches with the voluntary consent of an individual . . . ." (*Georgia v. Randolph* (2006) 547 U.S. 103, 109 [164 L.Ed.2d 208, 218-219] (*Randolph*); see *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219 [36 L.Ed.2d 854, 858] ["It is . . . well settled that one of the specifically established exceptions to the [warrant requirement rule] is a search . . . conducted pursuant to consent"].) Thus, the prohibition against warrantless searches of the home "does not apply . . . to situations in

13

which voluntary consent has been obtained, either from the individual whose [premises are] searched . . . or from a third party who possesses common authority over the premises." (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 181 [111 L.Ed.2d 148, 156].)

On appeal, defendant argues that consent was not a valid basis for Officer Wells's warrantless search of the home. First, he argues that Castro did not have the authority to consent to a search of defendant's home. Second, he argues that Streeter's consent given after she arrived home was involuntary. Third, he argues his own consent to search his home was involuntary. Last, he argues that Castro's probation search condition did not justify the search.[3]

The People contend that Streeter consented at the hospital. They also contend that Castro had authority to consent to the search. The People further argue that there was substantial evidence to support the trial court's conclusion that Streeter's consent was voluntary.

1.      *Officer Wells Exceeded the Scope of Any Consent Obtained*

         *From Streeter at the Hospital*

The People state the facts from the suppression hearing "clearly support . . . that . . . at the hospital Ms. Streeter consented to the officer thereafter proceeding to the residence, for the purpose of conducting a welfare check of the two other children . . . ." We conclude that Officer Wells exceeded the scope of Streeter's consent when he entered the home without her.

"The standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (*Florida v. Jimeno* (1991) 500 U.S. 248, 251 [114 L.Ed.2d 297, 302].) "A consensual search may not legally

---

[3]      Because the People do not contest the merits of this particular claim, and we find the entry to be unjustified, we do not reach the merits of this claim.

14

exceed the scope of the consent supporting it. [Citation.] Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of circumstances." (*People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1408.)

Here, Officer Wells exceeded the scope of Streeter's consent because he entered the house without her. At the suppression hearing Officer Wells testified on cross-examination as follows:

"Q. [Defense Counsel]: [You told Streeter] you needed to go and check on the children to make sure that the children were okay?

"A. [Officer Wells]: That I would like to go there and check on them, yes.

"[¶] . . . [¶]

"Q. [Defense Counsel]: And you told her that, you said, look I need to check on the other two children because of this information that had been related to you by the paramedic?

"A. [Officer Wells]: Correct.

"Q. [Defense Counsel]: And she kind of was cooperative with you, she said okay, let's -- *we'll* go *check on them*; is that right?"

"A. [Officer Wells]: Yes." (Italics added.)

Thus, according to Officer Wells, Streeter *explicitly* said they would go *together* and check on the children. Because the trial court credited Officer Wells's testimony, the only reasonable belief that Officer Wells could have possessed would have been that Streeter's consent was limited to their contemporaneous entry. (See *Florida v. Jimeno*, *supra*, 500 U.S. at p. 251 [114 L.Ed.2d at p. 302].) Accordingly, when Officer Wells entered the house without her he unlawfully exceeded the scope of Streeter's consent. (See *People v. Crenshaw*, *supra*, 9 Cal.App.4th at p. 1408.)

15

2. *Castro's Subsequent Unlimited Consent at the Home Was Not Effective Against Streeter's Prior Limited Consent*

Defendant next argues that Castro was unable to consent to the search of his home because "it was unreasonable for the police officer to believe that [Castro] had authority to consent to the police officer's search of [defendant's] home." Relying on *People v. Misquez* (1957) 152 Cal.App.2d 471, the People contend that because "at least one court has . . . concluded that a babysitter is indeed a person with the actual or apparent authority to consent to the search of the premises," Castro's consent was effective to justify the warrantless entry into defendant's home. We disagree with the People, albeit on grounds differing from those advanced in the parties' briefs.

It is well settled that third parties may consent to the search of the premises in certain instances. (See *Randolph*, *supra*, 547 U.S. at p. 109 [164 L.Ed.2d at pp. 218-219].) With respect to "a fellow occupant who shares common authority over property" (*ibid.*), "permission to search [will suffice when it is] obtained from a third party who possesse[s] common authority over or other sufficient relationship to the premises . . . ." (*United States v. Matlock* (1974) 415 U.S. 164, 171 [39 L.Ed.2d 242, 250].) In such circumstances, the pertinent inquiry is based on the facts known to the officer, was it objectively reasonable for the officer to believe that the consenting party had authority over the premises? (*Illinois v. Rodriguez*, *supra*, 497 U.S. at p. 188 [111 L.Ed.2d at p. 161].)

The question of third party consent, however, becomes more complicated when parties differ as to the consent they give law enforcement. While we could not locate authority involving one party giving *limited consent* and another party subsequently giving *unlimited consent*, cases involving instances in which a party gives consent following another's express refusal shed light on the present case.

In *Randolph* the United States Supreme Court held that a "physically present inhabitant's express refusal of consent to a police search is dispositive as to him,

16

regardless of the consent of a fellow occupant." (*Randolph*, *supra*, 547 U.S. at pp. 122-123 [164 L.Ed.2d at p. 227].) According to the Court, "[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to widely shared social expectations . . . . *Matlock* accordingly not only holds that a solitary co-inhabitant may sometimes consent to a search of shared premises, but stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." (*Id.* at p. 111 [164 L.Ed.2d at p. 220.)

The Sixth Circuit in *United States v. Jones* held that a handyman's consent to search the defendant's home after the defendant had already refused consent was insufficient to justify an officer's warrantless entry. (*United States v. Jones* (6th Cir. 2003) 335 F.3d 527, 531.) The court explained: "[A] handyman, clearly lacked actual authority to permit Officer Gilreath to enter the residence. His authority, even assuming that he had any, would have ceased at the point that [the defendant] denied consent to a search, which had to be understood by Officer Gilreath to include a denial of entry. Although it is true that an employee does in some instances have sufficient authority to consent to entry into or a search of his employer's residence, the lesser, and necessarily derivative, interest of the employee cannot override the greater interest of the owner. When the primary occupant has denied permission to enter and conduct a search, his employee does not have the authority to override that denial." (*Ibid.*)

Here, even assuming it was objectively reasonable for Officer Wells to conclude that Castro had authority to consent to the search of defendant's home, we conclude that Castro's subsequent unlimited consent was insufficient to justify Officer Wells's initial entry after Streeter had already limited her consent to a contemporaneous entry with Officer Wells. *Jones* provides guidance. Similar to the defendant's refusal of consent in *Jones*, here Streeter had *limited* her consent to contemporaneous entry with Officer Wells

17

while speaking with him at the hospital. Nevertheless, Officer Wells proceeded to her home without her and subsequently obtained unlimited consent from the babysitter, Castro, much like the unlimited consent received from the handyman by the officer in *Jones*. Because "the lesser, and necessarily derivative, interest of [an] employee[, like a babysitter such as Castro,] cannot override the greater interest of the owner" like Streeter, Castro's subsequent unlimited consent could not override Streeter's prior limited consent. (See *United States v. Jones*, *supra*, 335 F.3d at p. 531.)

The United States Supreme Court's decision in *Randolph* also supports our conclusion. Although the court in *Randolph* dealt with a physically present and objecting cohabitant, the court rested its decision on society's expectations between cohabitants. (See *Randolph*, *supra*, 547 U.S. at p. 111 [164 L.Ed.2d at p. 220].) The Court further explained as follows: "Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior, a fact reflected in a standard formulation of domestic property law, that '[e]ach cotenant . . . has the right to use and enjoy the entire property as if he or she were the sole owner, limited only by the same right in the other cotenants.' " (*Id.* at p. 114 [164 L.Ed.2d at p. 222].) In other words, while societal expectations support the proposition that cohabitants generally have equivalent rights to consent, or refuse consent, to the search of mutually shared premises, the Court implied that certain relationships might give one individual a greater claim of authority over the premises than the other.

Here, unlike cohabitants or cotenants, there is a clear hierarchy between a resident of a household and nonresident babysitter, like the relationship between Castro and Streeter, such that Streeter has a superior claim of authority over that of the consenting nonresident babysitter Castro. Therefore, Castro's subsequent unlimited consent at the home could not override or otherwise alter the nature of Streeter's limited consent at the hospital. (See *Randolph*, *supra*, 547 U.S. at p. 114 [164 L.Ed.2d at p. 222].)

18

3.      *Streeter's Consent at Her House and Defendant's Consent at*

        *the Hospital Were Not Lawfully Obtained*

Defendant contends that Streeter's consent after she returned home to find Officer Wells had already searched her house, and defendant's consent to search his home after he was arrested at the hospital, did not justify Officer Wells's warrantless entry.  We agree.[4]

" '[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.' " (*Schneckloth v. Bustamonte*, *supra*, 412 U.S. at p. 222 [36 L.Ed.2d at p. 860].) "The rule is clearly established that consent induced by an illegal search or arrest is not voluntary, and that if the accused consents immediately following an illegal entry or search, his assent is not voluntary because it is inseparable from the unlawful conduct of the officers." (*Burrows v. Superior Court* (1974) 13 Cal.3d 238, 251.)  Thus, the People " 'have the burden of proving . . . that the consent was lawful, . . . and was not inextricably bound up with unlawful conduct.' " (*People v. Lawler* (1973) 9 Cal.3d 156, 163.)

Here, both Streeter's subsequent consent at the home and defendant's consent at the hospital were not lawfully obtained.  Streeter arrived home to find Officer Wells had

---

**4**      The People contend that defendant never argued that his own consent was involuntarily obtained in the trial court and that claim is therefore forfeited on appeal.  In his motion to suppress, defendant specifically stated, "Mr. Fazzio was illegally arrested based upon the unlawful search of his house by Officer Wells, therefore any consent or other information obtained from him may not be used to justify the search."  Because he argued that his consent was involuntary as a result of Officer Wells's prior entry, it is clear that defendant properly preserved this argument for appeal.  (See *People v. Oldham* (2000) 81 Cal.App.4th 1, 12 ["defendants making a section 1538.5 motion 'must specify the precise grounds for suppression of the evidence in question, and, where a warrantless search or seizure is the basis for the motion, this burden includes specifying the inadequacy of any justifications for the search or seizure' "].)

19

already been inside her home.  Officer Wells arrested defendant at the hospital. Defendant and Officer Wells then proceeded to defendant's house to look for another gun.  Because there were no intervening events between Officer Wells's initial warrantless entry of defendant's home, and the subsequent consents of both defendant and Streeter, both their consents were products of the "[prior] unlawful search of [their home]" (*Burrows v. Superior Court*, *supra*, 13 Cal.3d at p. 251), such that their "consent[s] and the prior illegal search are inextricably joined . . . [and] cannot justify a further illegal search."  (*People v. Lawler*, *supra*, 9 Cal.3d at p. 164.)

It is well settled that "[t]he exclusionary rule . . . [bars] from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." (*Wong Sun v. United States* (1963) 371 U.S. 471, 485 [9 L.Ed.2d 441, 454].) Accordingly, because there were no intervening events between Officer Wells's initial warrantless entry into defendant's home and the finding of the weapons and other tangible evidence used against defendant during trial, all evidence obtained after Officer Wells's initial unlawful entry must be excluded as a fruit of the initial illegality.  (*Id.* at pp. 487-488 [9 L.Ed.2d at p. 455] [holding that the " 'fruit of the poisonous tree' " inquiry is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint' "].)

DISPOSITION

The judgment is reversed and the trial court is directed to vacate its order denying defendant's motion to suppress and to enter a new order granting that motion.

      ROBIE    , Acting P. J.

We concur:

      BUTZ    , J.

      MAURO    , J.